Case No. _____

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

Booker T. Wade Jr.,
Appellant

vs.

Arlene D. Stevens,
Appellee

**EMERGENCY MOTION FOR STAY PENDING APPEAL**
Pursuant to Circuit Rule 27-3

Booker T. Wade, Jr., In Pro Se
605 Forest Avenue
Palo Alto, CA 94103
415 378 6250
bookertwade@unseen.

# SUMMARY

The parties entered into a property Settlement Agreement to arbitrate any and all disputes arising during its implementation. There is no contest that Appellee defaulted on a demand for arbitration. No argument is advanced that Appellant is in default. After examining the merits of the disputes, the District Court denied motions to compel arbitration and stay the litigation, concluding that it lacked jurisdiction because Appellant's opposition to litigation in the Bankruptcy Court were insufficiently presented. The District Court created a new prerequisite to the applicability of the Federal Arbitration Act, ignoring that the Act limits the District Court to determining three factors: arbitral issues, jurisdiction, and any default on an arbitration demand by Appellant. The Court did not address whether arbitral issues exists or whether Appellant was in default of a demand for arbitration.

On jurisdiction, The District Court ignored the clarity of precedents and instead, muddled the issues. The Court's examinations of the merits, and the creation of a condition precedent of some unspecified required level of robust sufficiency in bankruptcy proceedings, are unsupported by any citations and are inconsistent with the objectives of the Act and interpreting precedents. Even if there was some insufficiency, that is not a jurisdictional defect, but an equitable defense, not raised by Appellee.

Appellee presented some disputes to the assigned arbitrator who ruled in her favor. She also presented some disputes to the arbitrator who ruled against her. Having taking the benefits of favorable rulings as to some disputes, Appellee now has gone forum shopping to the state Superior Court for favorable decisions that she lost before the arbitrator. The District Court has sanctioned this result. This Court should temporarily stay the proceeding pending appeal and thereafter, following a hearing, continue the stay and remand this case to the District Court with directions to compel arbitration.

### **9th Cir. R. 27-3 Certificate**

Pursuant to 9th Cir. R. 27-3, Appellant respectfully certifies that his motion for a stay pending appeal is an emergency motion requiring "relief… in less than 21 days" to "avoid irreparable harm." The facts so demonstrating areas follows.

The District Court for the Northern District of California, San Jose Division, on October entered its Order Denying Emergency Ex Parte Motion For Stay and Motion to Compel arbitration (Denial Order)" on October 9, 2014. See Exhibit A. The Denial Order declined to compel Appellee compliance with the arbitration provisions in a property settlement agreement entered into by Appellant and Appellee before the Presiding Judge of the Santa Clara County, California, Superior Court. The Denial Court also declined to stay the underlying proceeding. The Denial Order will permit an order of the U.S. Bankruptcy Court which lifted the automatic stay provisions of the Bankruptcy Code to go into effect, thereby implementing a state court judgment which would provide for the immediate execution upon the judgment, one entered by the state court and bypassing the appointed arbitrator. The execution upon the properties would commence as of October 30, 2014.

If the emergency stay is not issued, Appellant, age 72, will be evicted from his exempt principal residence, title to his property transferred involuntarily to Appellee who would then sell the property to a buyer. Alternatively, the property's homeowners' association would be enabled to foreclose on the property. Further, Appellant's creditors will lose distributions from estate funds which would be released from escrow accounts. Absent a stay, the very intent of the arbitration provisions to provide for a non-judicial forum for dispute resolution would be defeated.

Before filing his motion, Appellant notified counsel for Appellee and also provided him with an electronic copy of this motion, exclusive of exhibits which were served previously. Appellant also requested counsel for Appellee to defuse the emergency by agreeing not to seek execution upon the state court judgment pending this Court's consideration of this motion as an "Urgent" one. Counsel declined to do so. All grounds advanced in support of this emergency motion were submitted to the District Court as part of Appellant's motions to the District Court which motions the District Court denied.

Booker T. Wade Jr.

October 28, 2014

Pursuant to 9th Cir. R. 27-3(a)(3)(i), the telephone numbers, email addresses, and office addresses of the attorneys for the parties are as follows:

Attorneys for Appellee Arlene D. Stevens

David Hamerslough
Rossi Hamerslough Reich &Chuck
1980The Alameda Suite 200
San Jose, CA 95126
408 261 4252
Dave@rhrc.net
Molly@rhrc.net

## EMERGENCY MOTION

Pursuant to Circuit Rule 27-3, Appellant moves on an emergency basis for a stay of the District Court's October 9, 2014, order denying a motion to compel arbitration and denying a stay (Denial Order). Exhibit A. The Denial Order allowed the Bankruptcy Court's order lifting the automatic stay to become effective as of October 25, 2014. Execution upon the order is anticipated to commence immediately, i.e., as of October 30, 2014.

This emergency motion is made on the followings grounds:

1. In multiple decisions, the United States Supreme Court has made clear that where parties to a contract have agreed to resolve their disputes via arbitration and the disputes are within the arbitration provisions, and either party declines to so arbitrate, upon application, the District Court is mandated to compel arbitration and stay judicial proceedings pending such arbitration. The Supreme Court has concluded that a continuation of the judicial proceeding during arbitration fundamentally undermines the objectives of the U.S. Arbitration Act which pre-supposes irreparable harm and violates an overriding Congressional policy.

2. The Denial Order in rejecting the stay request did not address the pivotal questions or the mandatory stay provisions of the FAA. Unless the Denial Order is stayed, it would impose the injuries sought to be guarded against and completely render any subsequently non-stay orders on appeal meaningless, as the real estate property involved would be involuntarily transferred and a foreclosure sale proceed.

3. This Court has concluded that upon consideration of a motion to compel arbitration, the only relevant issues presented for review by the District Court are whether there are arbitral issues, as Appellant is not in default and the Court otherwise has jurisdiction. See, *Volt Information Sciences Inc. v Board of Regents of Leland Stanford Junior University*, (1989) 489 U.S. 478. There is no contest herein as to arbitral issues and that Appellant is not in default of a demand for arbitration. To the contrary, Appellant and Appellee have both presented disputes to the assigned arbitrator as to some issues.In its Denial Order, the District Court did not address the mandatory stay provisions of the FAA. In doing so, the emergency has been created.

4. The law governing issuance of a stay to compel arbitration fully supports Appellant's emergency motion.

## INTRODUCTION

This motion for stay is before the Court in aid of the Court's appellate jurisdiction of the District Court's order of October 9, 2014, denying Appellant's Motion to Compel arbitration (Denial Order), pursuant to the U.S. Arbitration Act (FAA).

Booker T. Wade Jr., Appellant seeks an emergency stay of the underlying bankruptcy proceeding, pending this Court review and decision resulting from on the Notice of Appeal filed with the District Court on October 22, 2014. Exhibit B. The appeal seeks review of the order from the District Court which denied a motion compelling arbitration of disputes arising under the property Settlement Agreement between Appellantand Arlene D. Stevens, creditor and Appellee [Stevens], his former business and non-marital partner, entered into on the record in the Santa Clara Superior County of California which provided for the division and liquidation of property acquired during their decades long relationship.

Under the FAA, when two parties have agreed, as herein, in a property settlement agreement, to submit contractual disputes to binding arbitration, precedents require that federal courts must accede to the arbitration. Indeed, upon request as herein made, the FAA provides that a U.S. District Court *shall* compel compliance with the arbitration provisions. Herein, the Bankruptcy Court has substituted its preferred resolutions of the contractual disputes, *overruling the arbitrator's uncontested rulings and bypassing the arbitrator as to unresolved disputes,* without findings or conclusions or an explanation. The District Court in denying the motion to compel arbitration has acquiesced to, and thereby in effect, ratified the decision of the Bankruptcy Court. The BankruptcyCourt did not respond to oppositions pleadings raising arbitration provisions. However, in a single sentence delivered orally from the bench in another proceeding, the Bankruptcy Court remarked that the FAA is "irrelevant." With respects, that conclusion defies the plain reading of the applicable provisions of the FAA. The Denial Order did not address the conclusions or holding of the Bankruptcy Court.

## JURISDICTION

This court has jurisdiction over the issues and subject of this motion as follows:

A. Of the underlying appeal of the order of the bankruptcy court converting the case to from one under Chapter 11 to one under Chapter 7, pursuant to 28 U.S.C. 157(b) and 158(d)(1) and Bankruptcy Rule 8001;

B. Of the underlying appeal of the order of the bankruptcy court lifting the automatic stay, pursuant to 28 U.S.C. 158(d);

C. Of the final denial order of the District Court, pursuant to 28 U.S.C 1291 and 1294(1);

The FAA permits an interlocutory appeal from an order refusing to stay litigation pending arbitration, 9 U.S.C. § 16(a) (1) (A), or an order denying a motion to compel arbitration, 9 U.S.C. § 16(a) (1) (B).

Appellant states that this is a "core proceeding" within the meaning of 28 U.S.C. Section 157(b) and that Appellant, a resident of Santa Clara County, California, is the Appellant in this case having filed on January 22, 2013.

## STANDARD OF REVEW

The courts of appeals review the denial of a motion to compel arbitration under the *de novo* standard. *Bushley v. Credit Suisse First Boston*, 360 F.3d 1149, 1152 (9th Cir. 2004); *Cox v. Ocean View Hotel Corporation,* 533 F.3d 1114, 1119 (9th Cir. 2008). Underlying factual findings, if any, are reviewed for clear error. *Balen v. Holland Am. Line Inc.*,583 F.3d 647, 652 (9th Cir. 2009). Interpretations of contract provisions are reviewed *de novo. Milenbach v. Commissioner*, 318 F.3d 924, 930 (9th Cir. 2003).

## FACTUAL BACKGROUND

A. The Settlement Agreement

Prior to February 2007, Appellant and Stevens maintained a 20-year non–marital business and personal relationship. Upon the breakdown of the relationship, disputes arose as to ownership interests in multiple assets acquired before and during their relationships, including residences in Palo Alto, California and Woodside, California; a commercial office building in Palo Alto; licenses issued by the Federal Communications Commission for a new FM radio broadcast station at Clarksdale, Mississippi, a new broadcast television station at Topeka, Kansas, cellular telephone licenses for College Station, Texas and Portland, Oregon; and intellectual property rights to certain television programs known as "Wedding Television."

The various claims and counterclaims resulted in state court litigation in a case entitled Arlene Stevens v. Booker T. Wade, Jr., et al, Santa Clara County Superior Court Case No.: 1-07-CV-090284). These claims were resolved in broad terms following two days of on-the-record conversations and negotiations before then-Superior Court Presiding Judge Jaime Jacobs-May, ending on January 23, 2009, as a "Settlement Agreement" which Appellant and Stevens agreed

would be binding and which was declared as binding by the Presiding Judge.[1] Although Stevens was required to reduce the agreement to writing, she did not. Thus, terms of the agreement were scattered among discussions and negotiations throughout a 117-page transcript. See Exhibit C. The terms of the agreement included the Presiding Judge appointing a JAMS Inc. arbitrator, Hon. Richard Silver (Ret.), to resolve any and all disputes arising under the agreement, including thirty two potential implementing disputes. A number of implementing disputes were presented to Judge Silver. Some of Judge Silver's decisions were favorable to Appellant while others were adverse to Appellant. Nearly all the assets within the ambit of the Settlement Agreement have been lost or dissipated, except for the Palo Alto condominium and about $988,600 which now sits in two escrow accounts.

1. The Palo Alto Condominium

One implementing dispute concerned the Palo Alto condominium. Prior to the filing of the Chapter 11 petition, Appellant held title and 100% ownership interests in certain real estate property known as 605 Forest Avenue, Palo Alto, CA. As of the petition date, the property became property of the estate and Appellant, age 72, under California exemption provisions, and has $175,000 in economic interests in the property that is exempt from collection action by creditors.

The Settlement Agreement provided that the condo would be sold and the proceeds divided between Appellant (40%) and Stevens (60%) and that Appellant and Stevens would share the burden of carrying costs in the same percentages. On May 10, 2010, Judge Silver ruled that because Stevens had defaulted on her obligation to pay her 60% carrying costs of the condo for 18 months, the requirement to sell the property was expunged, given its then value, and that Appellant thereafter would own interests the property solely. See Exhibit 2.[2]

Over a year later, Stevens re-presented her dispute as to the Palo Alto condo to Appellant, insisting that Judge Silver had committed error. About the same time, Appellant's former counsel in the state court proceeding, Hoge Fenton Jones and Appel Inc., had filed a judicial lien against the condo and noticed its intent to levy against Appellant's wages for amounts claimed due arising out of its representation. Thereafter, Appellant filed his Chapter 11 petition. Four days after filing the petition, Stevens filed in the state Superior Court, a motion to enforce

---

[1] Exhibit C, Reporter's Transcript at 114:23-25.
[2] Judge Silver's order was given orally at a hearing on May 11, 2010, as confirmed by the documentation shown in the Exhibit D.

theSettlement Agreement seeking to divest Appellant of ownership of the condo; however, Stevens withdrew the motion upon Appellant's complaint that the state court motion was in violation of the automatic stay. Thereafter, Stevens moved the Bankruptcy to lift the automatic stay and permit her to pursue litigation in the state court. The Bankruptcy Court granted the motion. On September 23, 2014, the Bankruptcy Court granted Stevens' second motion to lift the automatic stay and allow her to execute upon the summary judgment the state court entered as to the condo and other disputes. Thereafter, Appellant moved the District Court to compel arbitration and stay the proceeding. The Court denied the motions to compel and for a stay.

    2.  The Escrow Accounts

Approximately $993,600 now sits in two escrow accounts. The funds were in the accounts on the commencement date of the Chapter 11 Petition. The accounts are controlled by David Hamerslough and Stephen Fry, counsel for Stevens and creditors of Stevens. These funds are net proceeds of the sale of the Woodside residence which was owned equally by Appellant and Stevens as of the petition commencement date.

    B.  Bankruptcy Procedural History

On January 22, 2014, Appellant filed his Chapter 11 petition in the United States Bankruptcy Court for the Northern District of California. On June 6, 2013, Appellant moved the Bankruptcy Court for approval to reject the Settlement Agreement as an executory contract. The Bankruptcy Court denied its approval to reject the agreement, concluded both Stevens and Appellant were in default, but excused Stevens' default and concurrently lifted the automatic stay to allow Stevens to return to state Superior Court to seek a monetary judgment as to any non-performed obligations of Appellant. On September 5, 2013, the Bankruptcy Court denied its approval to Appellant's joint Proposed Disclosure and Reorganization Plan, concluding that Appellant's inclusion of the Palo Alto condo into the proposed plan as his property was inconsistent with the Settlement Agreement.

On December14, 2013, Stevens filed in the state court a motion to enforce the Settlement Agreement and award her damages for a host of complaints, including awarding her 100% interest in the Palo Alto condo. In response, Appellant moved the state Superior Court to accede to the arbitrator's decision that Stevens had forfeited any rights to the condo and that the condo need not be sold. Appellant also moved the state court that resolution of any implementation disputes was the sole province of the arbitrator. The state court conducted a summary proceeding

and did not address the motion or refer the matter the arbitrator but dismissed it as moot. On January 13, 2014, the state court granted Sevens' motion to enforce. Thereafter, Stevens presented to the Bankruptcy Court its proposed judgment for the state Superior Court. The Bankruptcy Court indicated its approval. Thereafter, on June 13, 2014, in an off the record next day notice "emergency" ex parte communications during Appellant's absence, Stevens presented the proposed judgment to the state court. On the same day, the Superior Court entered in its docket its judgment.

On June 11, 2014, the Bankruptcy Court issued to Appellant an Order to Show Cause Re: Dismissal or Conversion (OSC). The OSC fundamentally predicated dismissal or conversion upon a purported "re-write" by Appellant of the Settlement Agreement, given Appellant's inclusion of provisions to retain the Palo Alto condo in his original and revised proposed reorganization plans. On July 14, 2014, the Bankruptcy Court converted the case to one under Chapter 7. On July 29, 2014, Appellant filed his Notice of Appeal of the conversion order to this Court. The appeal is still pending. On September 23, 2014, the Bankruptcy Court granted a motion by Stevens to lift the automatic stay to allow Stevens to evict Appellant from the Palo Alto condo, take ownership of and sell the condo and retain for herself 100% of all proceeds, including Appellant's exempt interests.

## QUESTIONS PRESENTED

Under the FAA, The District Court was required to address two and only two questions in considering the motion to compel arbitration. "The District Court is limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue*." Chiron Corp. v. Ortho Diagnostic Systems Inc*., 207 F.3d 1126, 1130 (9th Cir. 2000). See, also, *In Kevin Khoa Nguyen v. Barnes & Noble Inc*., 2014 U.S. App. LEXIS 15868 (9th Cir. 2014).

## ARGUMENT

A.  The FAA strongly favors enforcement of valid arbitration agreements.

The Supreme Court has held that the FAA expresses a binding Congressional policy in favor of arbitration that preempts contrary law, policies and provisions. *AT&T Mobility LLC v Conception* (2011) 563 U.S. 321[*Conception*]; *Volt Information Sciences Inc. v Board of Regents of Leland Stanford Junior University,* (1989) 489 U.S. 478 [*Volt*]. The Court has invalidated state court rules, policies and laws that sought to restrict arbitration provisions. See, e.g., *Conception,*

*supra*, [invalidating California provisions as to unconscionability as a defense to arbitration]. See, also, *Marmet Health Care Center Inc. v Brown* (2012) 123 S.Ct. 1201[invalidating a West Virginia public policy defense provision]. The high court has concluded that where a contract includes an agreement to arbitrate, the parties are obligated to proceed in arbitration only.*Volt, supra*, 478. Where a party refuses arbitration of arbitral disputes, a party may petition a District Court to compel arbitration. 9 U.S.C. 4. Upon consideration of a petition to compel arbitration, and finding arbitral issues, the District Court must compel compliance. *Volt, supra*, 478.

Section 2 of the FAA provides that the District Court *shall* enforce arbitration contract provisions according to their terms. *Circuit City Stores Investments v Adams*, (2001) 523 U.S. 105, 111. *Volt, supra.*The FAA envisions a "liberal federal policy favoring arbitration." *Moses H. Cone Memorial Hospital v. Mercury Construction Corp*, (1983) 460 U.S. 1, 24 [*Moses Cone*]. The effect of Section 2 is to create a body of federal substantive law on arbitration. *Moses Hospital, supra*, at 24.

Section 4 of the FAA provides that "a party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court . . . for an order directing that such arbitration proceed in the manner provided for in such agreement." 9 U.S.C. Section 4. Herein, the Bankruptcy Court has permitted Stevens to refuse to arbitrate the disputes arising under the Settlement Agreement made on the record before the then Presiding Judge which is binding as a written agreement under Section 664.6 of the *California Code of Civil Procedure*.

The entire Chapter 11 case, including the inclusion of the Palo Alto condo in the original and revised reorganization plans, and the order denying turnover of estate funds, has been predicated erroneously upon the Bankruptcy Court requiring compliance with the *Bankruptcy's Court's own interpretations* of Debtor's obligations under the Settlement Agreement. See "Order Denying Approval of the First Amended Proposed Combined Plan of Reorganization and Disclosure Statement, entered on May 7, 2014;" United States Trustee's Motion to Dismiss or Convert Chapter 11 Case", filed June 10, 2014, at 6, lines 16-19, [quoting the Court as maintaining that Debtor is unable to effectuate a plan because Debtor is attempting to "vitiate" the Settlement Agreement (by proposing to comply with the arbitrator's ruling and not sell the Palo Alto condo). However, under the FAA, 9 U.S.C. Section 4, as the Settlement Agreement provided that interpretations and resolution of compliance and implementation disputes were

delegated exclusively to the JAMS Inc. arbitrator, the Bankruptcy Court lacked jurisdiction to interpret the Settlement Agreement. *Conception, supra*; *Paramedics ElectromedicinaComercial, Ltda. v. GE Med. Systems. Information Technologies., Inc.*, 369 F.3d 645, 653 (2d Cir. 2004) (affirming district court's grant of motion to compel).

      Recently, the Supreme Court reiterated its decades-long steadfast holding. It held that "when parties commit to arbitrate contractual disputes, it is a mainstay of the FAA's substantive law that interpretation and resolution of disputes under the agreement are to be resolved by the arbitrator, not by a federal or state court." [Emphasis supplied.] *Nitro-Lift Technologies LLC*, (2012) 133 S.Ct. 500, 503. A disregard of this principle compels a reversal by a reviewing court. *Nitro-Lift, supra*, at 503. Any ramifications or consequential factors under the agreement can only come from the arbitrator. *Conception, at* 1747 [holding that rationalizations and judicial hostility toward arbitration are not permitted]. Under *Conception*, federal courts are required to compel compliance with the arbitrator's decision and confirmation of those decisions*, supra*, at 1748. Despite the foregoing, neither Stevens nor the Bankruptcy Court even acknowledge or address the existence of the arbitration agreement provisions.

      Courts within the Ninth Circuit in considering stay relief have routinely enforced arbitration clauses in prepetition contracts between bankruptcy debtors and their creditors so that non-core claims can be resolved through arbitration. See, e.g., *In re Roosevelt*, 176 B.R. 196, 200 (9th Cir. BAP); In *re Mor-Ben Insurance Markets Corp*, 73 B.R. 644, 647-49 (9th Cir. BAP 1987); *In re Saigon Plaza Association LLC*, No.07-4149, 2007 WL 3357641, at *2, 7 (N.D. Cal. Nov. 5, 2007); *In re Allen & Hein Inc.*, 59 B.R. 733, 735 (Bankr. S.D. Cal. 1986).

      Although the FAA provisions were argued to the Bankruptcy Court, the Court never addressed the applicability of the FAA. Instead, in an off-the-cuff remark when granting Stevens' motion to lift the automatic stay, the Court declared the arbitration clauses of the Settlement Agreement as "irrelevant" without discussion, analysis or explanation. The District Court sidestepped addressing the FAA and arbitration provisions.

      For most of the time, the proceeding has been dormant as Judge Silver has heard and resolved all disputes presented to him. Indeed, over four years ago in 2010, after providing advance notice, Judge Silver terminated the arbitration proceeding. Prior thereto, he specifically advised the parties of the intended termination, unless either party had remaining disputes for resolution. However, neither party responded to the notice nor presented any disputes to Judge

Silver. Precedents required the District Court to apply the FAA provisions. The failure to do so was error.

    B.  <u>Upon Appellant making the required showing, the District Court lacked discretion<br>to deny the stay.</u>

The Settlement Agreement provided that any and all implementing disputes arising would be resolved by Judge Silver. The agreement is reflected in the exchange of the Presiding Judge as follows:

> "First, he [Judge Silver] may try to mediate it. I don't know how he works. He may try to get you guys to agree to something. Ultimately, whether it's this issue or any issue, you are agreeing to have Judge Silver decide things, act as an arbitrator...with these principles in mind...binding arb – that's another way of putting it, yes, binding arbitration. He makes the call and you're done, both ways. Nobody can appeal it. Nobody can fight it."

Exhibit A, Reporter's Transcript at 98:27-28; 99:1-11.

For clarity and emphasis, the Settlement Agreement also addressed dozens of potential implementing disputes, including each and every one which was delegated to Judge Silver but resolved by the Superior Court. A table showing the specific disputes as delegated to Judge Silver but adjudicated by the Superior Court is shown at Exhibit E. Again, there is no contest herein of the requirement to arbitrate and that the arbitral disputes were adjudicated by the Superior Court.

The FAA requires federal districtcourts to stay judicial proceedings and compel arbitration of claims covered by a written and enforceable arbitration agreement. 9 U.S.C. Section 3. The FAA limits the district court's role to determining whether a valid arbitration agreement exists, and whether the agreement encompasses the disputes at issue. See *Chiron Corp. v. Ortho Diagnostic Systems Inc.*, 207 F.3d 1126,1130 (9th Cir. 2000).

The parties herein do not contest that the Settlement Agreement requires arbitration of any and all disputes arising under the Settlement Agreement. The parties do not contest that the Settlement Agreement encompasses the claims adjudicated by the Superior Court. Indeed, both Appellant and Appellee submitted disputes to the arbitrator who resolved some disputes in favor of Appellant and some in favor of Appellee. See Exhibit C. In lieu of contesting arbitral issues, Appellee took the hints and declarations of the Bankruptcy Court which held the Settlement

Agreement sacrosanct, pre-approved the judgment and brushed off the FAA as "irrelevant." The District Court followed the Bankruptcy Court without addressing the pivotal issues.

In its Denial Order, the District Court devotes much of its discussion and analysis to the merits of the prepetition underlying proceeding in the state court, as reflected in the Bankruptcy Court's order denying its approval of Appellant's motion to reject the Settlement Agreement. Compare, Denial Order, at 1-3. However, as the parties intended the arbitrator to decide any and all disputes, the District Court lacked the authority to examine the arbitration procedures as to the merits of the underlying disputes. That is outside the scope of the consideration of a motion to compel arbitration. See *Volt*, *supra*, 1130-1131. Only the questions presented above are to be considered. *Id.* Where the parties do not challenge the applicability of the arbitration provisions, the FAA restricts the courts' "…review to deciding only whether the dispute is arbitral, that is whether the dispute[s] are within the scope of the parties' agreement to arbitrate." *Chiron*, at 1131.

   C.   <u>Absent a Stevens challenge to the arbitration provisions, the District Court was limited to deciding only whether the current disputes were arbitral.</u>

This Court has made it clear: where the parties do not challenge the applicability of the arbitration provisions, the FAA restricts the courts' "…review to deciding only whether the disputes arearbitral, that is whether the dispute[s] are within the scope of the parties' agreement to arbitrate." *Chiron*, at 1131.

Rather than address the pivotal questions, the District Court examined the merits of the pending litigation in the state court and in the Bankruptcy Court, as reflected in a decision of the Bankruptcy Court declining to reject the settlement agreement as an executory contract. In delving into the merits of the disputes and failing to determine answers to the pivotal questions, the District Court committed error.

The District Court then concluded that while Appellant placed in issue the arbitration requirements before the Bankruptcy Court in different pleadings, Appellant failed to place them "sufficiently." As detailed below, Appellant contends that the issues were sufficiently placed in issues, and that, even if not sufficiently placed, the FAA as interpreted by the Supreme Court and this Court, precludes such an inquiry as defeating the very objectives of arbitration – shielding the parties from the very litigation the Bankruptcy Court forced upon the Appellant and which the District Court criticizes as inadequate litigation.

The regime undertaken  and suggested by the District Court - of examining the merits of the underlying disputes via the order denying approval to reject the Settlement Agreement and the need for Appellant to have conducted a robust demand to litigate the request for arbitration , defeats the very objectives of arbitration.  To litigate robustly would require— before Appellee can be held to contractually agreed bilateral arbitration— "…that a federal court determine (and the parties litigate) the legal requirements for success on the merits claim-by-claim and theory-by-theory, the evidence necessary to meet those requirements, the cost of developing that evidence, and the damages that would be recovered in the event of success. Such a preliminary litigating hurdle would destroy the prospect of speedy resolution that arbitration ….was meant to secure. The FAA does not sanction such a judicially created superstructure."

D.  The District Court was provided with an independent basis for jurisdiction.

Section 2 of the FAA provides for one condition to be applicable. The condition is that the District Court must have an independent basis for subject matter jurisdiction over the parties or the issues. See, *Moses Cone*, at 25, Note 32. (holding that to assert a cause of action under the Act, there "…must be diversity of citizenship or some other independent basis for federal jurisdiction").

The District Court concluded (1) there is no independent basis for District Court jurisdiction and (2) Appellant failed to have "properly presented" an argument to the Bankruptcy Court via a motion to compel arbitration. Denial Order, at 5 and 7.

Independent Basis

The Settlement Agreement covers a panoply of property and economic interests, including real estate in two states, licenses issued by the Federal Communications Commission, and intellectual property. Plainly, these assets after are involved in commerce, even interstate commerce. Neither Sevens nor the Bankruptcy Court nor the District Court so contest. As such, they are within the parameters of Section of the FAA. 11 U.S.C. 2.

That jurisdictional basis herein is the Bankruptcy Code enacted by Congress. 11 U.S.C. 1 et. seq. Appellant submits that his filing of the petition in bankruptcy invoked the panoply of provisions of the Bankruptcy Code, including jurisdiction over the bankruptcy "case" as an arm of the District Court. 28 U.S.C. 1334(a). This includes jurisdiction over the debtor's property as property of the estate. 28 U.S.C. 1334(e)(2). This includes property of the Appellant as debtor as of the date of the filing of the bankruptcy petition. See In re *Tucson Estates Inc.* (9th Cir. 1998)

153 F 3d 991, 996. *In re Anderson* (9th Cir. BAP 1992) 149 BR 591, 594. The filing of the petition transferred all of Appellant's property to the bankruptcy estate to be administered by the Bankruptcy Court. 28 U.S.C. 1334(a); .All of the property within the state court judgment was property of the estate. Indeed, in filing her motion to lift the automatic stay to execute upon the Palo Alto condo and the escrow funds, Stevens acknowledges federal jurisdiction over the property detailed in the Settlement Agreement as within the jurisdiction of the federal bankruptcy laws. While the District Court may or may not have direct jurisdiction over the Settlement Agreement itself as a local contract, it has very specific jurisdiction over the estate property which may be within the ambit of the Settlement Agreement. Appellant maintains that bankruptcy questions as federal questions provide an independent basis for jurisdiction. Compare, *DVC-JPW Investors v. Gershman*, 5 F.3d 1172, 1174 (8th Cir. 1993) (holding that federal securities fraud provisions constitute federal questions in arbitration agreements). In any event, Appellant's "right to relief depends upon the construction or application of the laws of the United States."*Merrell Dow Pharms. Inc. v. Thompson*, 478 U.S. 804, 809 Note 9 (1986) (*quoting Smith v. Kansas City Title & Trust Co.*, 255 U.S. 180, 199 (1921)).

The District Court's more specific holding is that Appellant has not demonstrated an independent basis for federal jurisdiction over the "underlying substantive dispute." Denial Order, at 6, citing *Geographic Expeditions Inc. v Estate of Lhotka ex rel Lhotak*, 599 F.3d 1102, 1106 (9th Cir. 2010). Appellant submits that the District Court misreads its cited case and otherwise overlooks and thus does not address the obvious bankruptcy case as containing federal questions.

Underlying the dispute in *Lhotak* was a negligence action between citizens of states. The pivotal question was whetherthe amount in controversy satisfied the requirement. *Lhotka* is not applicable herein. *In Lhotka*, the issue presented involved satisfying the prerequisites for a successful removal action. See *Gausv. Miles, Inc.*, 980 F.2d 564, 566 (9th Cir. 1992). *Lhotka* holds that a party seeking removal must prove by a preponderance of the evidence that removal is proper. *Lhotka*, at 1106-07. That holding is not relevant herein.

The FAA rests on entirely different grounds than the removal diversity statute. The Supreme Court has concluded that the FAA is an *anomaly* in federal jurisprudence, i. e., a departure from traditional analysis, as it reflects an overriding Congressional policy of liberally favoring arbitration over litigation. See *Moses Cone*, at 25 n.32. The FAA creates its distinct substantive

case law, replacing traditional analysis. *Id.* An equitable defense, even if valid, does not eliminate jurisdiction, *Lhotka*, at 1108. As such, the District Court reliance on *Lhotka* is misplaced. Further, this Circuit has recognized that property settlement claims in a Chapter 7 case are within the scope of the Bankruptcy Code. *Roosevelt, supra,* at 204-207.

*Not Sufficiently Presented*

The District Court acknowledges that Appellant argued to the Bankruptcy Court that it was required to accede to the arbitration provisions. Denial Order, at 5-6. The Court's conclusion is that Appellant did not complain <u>sufficiently</u> and that Appellant should have presented a formal motion to compel arbitration tothe Bankruptcy Court, as the District Court is an appellate court and not a court of original jurisdiction. Denial Order, at 6. Appellant has several responses.

First, Appellant maintains that the District Court has first resort jurisdiction, however characterized, over his motion to compel arbitration. The plain language of <u>Section 4</u> of the FAA specifically provides that where a party to an arbitration agreement declines to arbitrate, the other party may petition a <u>district court</u> for an order to compel arbitration. Just two months ago, this Circuit has made it quite explicit that the District Court has such jurisdiction. It held -

> The FAA, 9 U.S.C. § 1 et seq., requires *federal district courts* to stay judicial proceedings and compel arbitration of claims covered by a written and enforceable arbitration agreement. Id. § 3. [Emphasis supplied.]

*Nguyen v. Barnes & Noble Inc.,* 2014 U.S. App. LEXIS 15868 (9th Cir. August 18, 2014).

There is no requirement in the FAA that the motion to compel be first presented to the Bankruptcy Court. While that requirement may apply in normal cases, the FAA is a broad grant of authority, an anomaly, creating its own substantive law. *Moses Cone, supra,* Note 32.

The District Court acknowledges parenthetically Section 4, but omits to apply it. Instead, the District Court inexplicably cites Section 3, the mandatory stay provisions. Nothing in Section 3 requires a first resort to the Bankruptcy Court. Appellant notes that the Denial Order does not provide any precedents interpreting Section 3 in support of its holding.

Second, as the FAA is an anomaly, distinct from traditional procedure, Appellant submits that the District Court may not *sua sponte,* raise a defense not specifically detailed in the FAA and not on the face of the motion to compel. Further, a hearing is necessary if material fact

issues exist. While an evidentiary hearing is not required in every case, and the District Court may summarily decide whether to compel arbitration based on affidavits, pleadings, discovery, and stipulations, the court may not deny Appellant an opportunity to respond and then advocate for Stevens. In these circumstances, a district court has the power to enter a preliminary injunction to maintain the status quo before resolving a pending motion to compel arbitration. *Janvey v. Alguire*, 647 F.3d 585 (5th Cir. 2011).

Third, the courts of appeals recognize jurisdiction under the FAA either broadly, by "looking through" to the underlying dispute, or narrowly, by adhering strictly to the well-plead complaint rule and requiring the face of the complaint to state the reason for jurisdiction. This circuit takes a slightly different view. In *Carter v. Health Net of California, Inc.* 374 F.3d 830, 836 (9th Cir. 2004), the Court concluded that "a petition to compel arbitration because the dispute falls within the scope of an arbitration clause will turn on the interpretation of the clause, regardless of whether the actual disputeimplicates any federal laws.'" That language implies that the court will not look to "whether the actual dispute implicates any federal laws," but instead will require the face of the complaint to provide for federal jurisdiction. In any event, herein, whether the Court looks through the motion to compel or only the face of the motion, Appellant has demonstrated the present of a federal question as to bankruptcy law.

Fourth, as to the lack of "sufficiency" of presentation of the issues before the Bankruptcy Court, to any extent that constituted a waiver of the right to compel arbitration, it does not present a subject matter jurisdictional bar. Rather, it is an issue based in equity. This view is supported by the precedent cited by the District Court. Denial Order, at 4, citing *In re Magnacom Wireless LLC*, 503 F.3d 984, 996. *Magnacom* does not support the holding in the Denial Order. Instead, it holds just the opposite. *Magnacom* holds that presenting an issue on appeal not raised below is a waiver based in judicial estoppel and that judicial estoppel is an equitable doctrine. Appellant submits that equitable relief to Stevens of a waiver pre-supposes a jurisdictional foundation. Given the jurisdictional foundation, the District Court was limited in its consideration to whether arbitral issues were presented. The FAA precludes the District Court from an analysis of the merits of the disputes, including any purported equitable defenses.

Fifth, Appellant notes that the Denial Order reflects that the District Court did a survey of the docket of the Bankruptcy Court and described some pleadings raising the arbitration issues but not all such pleadings. Apparently, the District Court overlooked other pleadings where the

arbitration argument was more fully detailed and which the Bankruptcy Court rejected. In one such pleading seeking a stay and requesting the court to require arbitration and in opposition to the motion to lift the automatic stay to permit Stevens to secure a judgment in the Superior Court, Applicant presented a pointed argument, as restated, albeit with some inconsistency, by the Bankruptcy Court. The Court responded this way -

> "Debtor's argument that his settlement agreement with Stevens violates the Federal Arbitration Act is irrelevant to the merits of this appeal. As the Court has informed Debtor on numerous occasions, this court does not have the authority to overturn the judicially-supervised settlement agreement and subsequent state court judgment. See Order Converting Case to chapter 7, entered concurrently herewith; *Rooker v Fidelity Trust Co.*, 263 U.S. 413 (1923); *District of Columbia Court of Appeals v Feldman*, 460 U.S. 462."

Order Denying Ex parte Motion for Stay Pending Appeal, at 2, entered July 15, 2014.[3]

Throughout the bankruptcy proceeding, since the court denied Appellant's motion to reject the Settlement Agreement as an executory contract, the Bankruptcy Court, as reflected above, has made clear its total reliance on the state court producing a litigated judgment. Having made direct arbitration arguments in opposition to Stevens' motion in the Bankruptcy Court, and with the Bankruptcy Court declaring the arbitration provisions irrelevant, it would been an exercise in futility to file a formal motion to compel arbitration of a matter. Indeed, the Bankruptcy Court on multiple occasions indicated its impatience with the Appellant's insistence on complying with the arbitration provisions. Further, the District Court in its Denial Order chastises Appellant for his repeat efforts at persuasion of the applicability of the arbitration

---

[3] In a related proceeding filed with the District Court on June 8, 2014, Appellant moved the District Court to declare as void an order of the Superior Court which adjudicated disputes under the Settlement Agreement and entered a judgment thereupon. The Court declined to do so, citing *sua sponte*, the *Rooker Feldman Doctrine*. Appellant maintains that doctrine is not absolute and herein is not applicable, *inter alia*, as applicability requires that the judgment be final, and entered before commencement of the case and Appellant's defenses and counterclaims were heard. *See, e.g., Mothershed v Justices of Supreme Court*, 410 F.3d 602, 404 n.1; *Exxon Mobil Corp v Saudi Basic Industries Corp.*, 544 U.S. 280. Neither of these conditions was satisfied herein. Instead, the state court summarily dismissed them as moot, the judgment was entered 18 months post petition and is still pending in state courts. Still, the motion to compel to the District Court did not seek the invalidation of the state court judgment. Instead, it sought relief as specifically authorized by the FAA.

provisions, specifically noting the Appellant's direct argument has been that the arbitrator, not the state court, should have resolved the disputes. Denial Order, at Note 2.

### Waiver

Waiver by conduct cases require that the moving party be guilty of conduct that is inconsistent with a desire to arbitrate or cause some injury to the defending party. *Britton v Co-Op Banking Croup*, 916 F2d. 1405, 1412.*Marie v Allied Home Mortgage Corp.*, 402 F 3d 1, 16 (1st Cir. 2005). That party has a heavy burden of proof. *Britton*, at 1412. Herein, Appellant has submitted to arbitration and has consistently demanded arbitration, even if those demands were not sufficiently direct and robust. But Appellant has not shown any resistance to arbitration and the District Court does cite otherwise. The District Court impermissibly inverts the waiver test. It is Appellee who resists. Further, that defense is not submitted by Appellee, but raised *sua spontae* by the District Court and without affording Appellant an opportunity to respond, assuming the heavy burden was met.

E. Upon finding that there are arbitral disputes, Section 4 of the FAA by its terms provides for a mandatory stay, denying the District Court any discretion.

Normally, this Court requires that to secure a stay of a proceeding, an applicant must demonstrate four factors; likelihood to succeed on the merits of the appeal; irreparable injury; lack of substantial harm to Appellee; and no harm to the public interest. See *In re Wymar*, 5 B.R. 802, 806 (9th Cir.1980) (relying on *Schwartz v. Covington*, 341 F.2d 537 (9th Cir.1965).

The FAA is not a normal statute. The Supreme Court has concluded that Congress intended to differentiate the FAA provisions from other ordinary statutes. The FAA is an anomaly, unique within federal jurisprudence. See *Moses Cone, supra*, Note 32.Where agreements so provide for arbitration, the FAA preempts contrary state and federal procedural, rules and policies. *Conception*, at 131 S Ct at 1744, 1747. This, the District Court in relying upon the normal provisions of demonstration compliance with the normal test, miss-apprehends the FAA. Further, the District Court's logic proves too much. If accepted, it would effectively render Section 2 of the FAA as redundant and meaningless. The District Court was required to determine if there are arbitral issues, and, if so, it was required to stay the underlying proceeding. Having failed to determine if there are arbitral issues and then denying the stay request, the Denial Order is inconsistent with theFAA .

Further, the Denial Order rests on a misreading of *In re Yeganeh*, No 06-2788, 2006 WL 1310447, Note 4, and a decision of the District Court. Appellant maintains that reliance on that case is misplaced. The case involves an issue as to the authority of the Trustee to compromise a claim. It very expressly concludes that a motion for stay utilizing the ordinary standards detailed in *Wyma*r and *Schwartz*, cited above, applies to cases where the District Court has discretion to deny a stay. *Yeganeh* provides -

> "The parties agree that Appellant is requesting a *discretionary stay*, for which the applicable standard is
>
> 1. Appellant is likely to succeed on the merits of the appeal.
> 2. Appellant will suffer irreparable injury.
> 3. No substantial harm will come to Appellee.
> 4. The stay will do no harm to the public interest."

*In re Yeganeh*, Legal Standard, par. 1. [Emphasis supplied.]
*Yeganeh* by its own terms, apples to discretionary stays. As Section 3 of the FAA provides for mandatory stays, *Yeganeh* does not apply herein.[4]

The District Court holds that Appellant did not present a motion to stay to the Bankruptcy Court. Denial Order, at 7. The District Court apparently overlooked the stay motion filed on July 15, 2014. Critically, the Bankruptcy Court, as noted above, acknowledges that Appellant "on numerous occasions" has placed in issues the arbitration requirements. Additionally, on October 20, 2014, Appellant filed with the Bankruptcy Court an Emergency Ex Parte Motion to Compel Arbitration and Stay. The Court has delayed acting upon the motion.

Alternatively to the above, and given that there is at a minimum some tension as between the applicability of which test applies, Appellant maintains that the test for a discretionary stay is also satisfied. First, Appellant will likely prevail on the merits as there is no contest as to his satisfying the requirements of the FAA that there be arbitral issues and a non-default by Appellant. The conclusion of the District Court that the Court lacks jurisdiction ignores that an equitable defense is not a jurisdictional defect, as detailed above. A loss of a primary residence is irreparable harm. See *Carpenter Tech. Corp. v. City of Bridgeport*, 180 F.3d 93, 97 (2d Cir. 1999); *Avila v. Stearns Lending, Inc.*, 2008 WL 1378231, at *3 (C.D. Cal. April 7, 2008); *Nichols v. Deutsche Bank Nat. Trust Co.*, 2007 WL 4181111, at *2 (S.D. Cal. Nov. 21, 2007); *Wrobel v.*

---

[4] The Denial Order in support of its holding cites *Yeganeh*, at *4. However that note addresses issues concerning the taking of judicial notice, matters not relevant herein.

*S.L. Pope & Assocs.*, 2007 WL 2345036, at *1 (S.D. Cal. June 15, 2007). No harm will come to Appellee as there is no degradation of the property but likely an appreciation value and there is no loss to the escrow funds as interest accrues on the funds daily. Finally, n o public interest is implicated herein.

Pivotally, Appellant notes that this Circuit has concluded that a stay request to the District Court under the FAA is mandatory, except where the District Court has determined that there are no arbitral issues. *Britton*, at 1412, Note 8. As there arbitral issues herein, a stay is mandatory.

F. The Settlement Agreement is not valid or enforceable.

The Settlement Agreement as a contract is required by state and federal law to be a valid and enforceable contract. *California Code of Civil Procedure*, Section 1281 ["…valid, enforceable and irrevocable, save upon such grounds as exist for the revocation of any contract]; 9 U.S.C. 2 ["…valid, irrevocable, and enforceable, save upon such grounds as exist at law or equity for the revocation of any contract"]. However, the then state court Presiding Judge who ordered the agreement bound disclosed that her actions in concurrently mediating and declaring the Settlement Agreement as binding, while concurrently negotiating employment opportunities with the JAMS arbitrator, violated C.C.P Section 170.1(a)((6) and required her disqualification. She entered her disqualification on in the state court docket on April 2, 2010. See Exhibit F.

Under 75 years of precedents, the California Supreme Court has held that the orders of a disqualified judge are void. *Giometti v Etienne* (12934) 219 Ca. 687, 688-689. Further the state courts of appeal have held that such orders are *void ab ignitio*. *Christie v City of Centro* (2006) 135 Cal.App.4th 767, 777.;*La Serena Properties LLC v Weishback*(2010) 186 Cal.App. 893, 905. The Settlement Agreement is only binding facially because the Presiding Judge so declared and so ordered. RT, at 106:24; 25-38; 107:1-8. Consequently, the order of the Presiding Judge binding the Settlement Agreement is void and thereby lacks validity and enforceability under Section 2 of the FAA.

As the state court judgment is based upon an unenforceable void agreement, it is also void as it lacks legal support. A void judgment is subject to collateral attack in any forum, including federal courts. This has been the rule for more than a hundred years, at least since *Pennoyer v. Neff*, (1878) 95 U.S. 714, 24 L.Ed. 565. More recently, the Supreme Court has held that collateral attack on the grounds that the policy underlying precluding collateral attacks to

end litigation, was outweighed by a strong federal policy that would be obstructed if a court was allowed to act in excess of its jurisdiction. *Kalb v. Feuerstein* (1940) 308 U.S. 433, 438-429. In *Kalb*, the defendant in a mortgage foreclosure proceeding in a state court filed a petition in bankruptcy in a federal court. His collateral attack on the jurisdiction of the state court was allowed, despite the general rule that a judgment by a court of competent jurisdiction "bears a presumption of regularity and is not thereafter subject to collateral attack." *Id.* at 438. The Supreme Court held that there must be an exception to this rule where Congress has expressed a strong policy that would be thwarted by a usurpation of jurisdiction.[5] In giving exclusive jurisdiction over bankruptcy to the federal courts and ousting the state court of jurisdiction over estate property, bankruptcy law reflects such a strong federal policy. The policy is so strong that its core is enshrined in the Constitution. U.S. Constitution, Article I, Section 8, Clause 4.

As detailed above, the national policy favoring arbitration is a strong policy. The last phrase of Section 2 permits arbitration agreements to be declared unenforceable "upon such grounds as exist at law or in equity for the revocation any contract." This clause permits agreements to arbitrate to be invalidated by generally applicable contract defenses. *Doctor's Associates Inc. v Casarotto* 517 U.S. 681, 687.See, also, *Perry v Thomas* (1987) 482 U.S. 483, 492-493 n. 9.

As a part of his Brief on Appeal, Appellant, as an alternative to compelling arbitration, Appellant will maintain that the Settlement Agreement is not enforceable. As such, there would be no basis for the Bankruptcy Court's converting the case to one under Chapter 7 or lifting the automatic stay to permit Stevens to enforce the Settlement Agreement.

## OTHER CONSIDERATIONS

While the underlying facts and procedural history presented are complicated, the legal issues presented are entirely uncontested and straight forward: there are arbitral issues and a default and forum shopping by Appellee. One overarching characteristic of the proceeding in the

---

[5] The District Court, citing the order of the Bankruptcy Court declining to grant its approval to rejection of the Settlement Agreement, makes much that Appellant has on multiple occasions sought to invalidate the Settlement Agreement. Denial Order, at 6-7. However, a void court order is subject to repeated attack. Further, the cited pleadings were not considered on the merits. The state appellate courts declined to consider the challenges out of turn. Further, the Bankruptcy Court characterizes Appellant's challenges as based on "...perceived unfairness or a lack of impartiality on the part of Judge Jacobs May and Judge Silver." With respects, Appellant responds that the Court unfairly distorts Appellant's argument. Appellant's argument was simply that the applicable state statutes disqualified the judge and the arbitrator because of the judge's conflict of interest, i.e., a statutory presumption of a pecuniary interest in the outcome of the case.

23

state court and the bankruptcy court has been that each court without exception has issued summary decisions, without opinions, findings or statements of decisions. The Superior Court summarily declined to vacate the void judgment binding the Settlement Agreement without addressing applicable precedents. The Superior Court also summarily granted the motion to enforce Settlement Agreement with a one-liner of "motion granted" without analysis, discussions. On appeal, the state Court of Appeal summarily denied a motion to compel with four words, "The motion is denied." The Bankruptcy Court has followed, holding that the *Rooker Feldman* Doctrine absolutely precludes it from examining the state court judgment, but without addressing the conditions, qualifiers and exceptions to the doctrine. Similarly, the Bankruptcy Court has declined to address the applicability of the FAA. In short, the lower courts have given Appellant short shrift.

Appellant submits that the prime factor driving the courts is a shared response to Appellant for declining to waive the disqualification of the Presiding Judge of the Superior Court and Appellant's complaint that the Presiding Judge designated her replacement as assigned judge, rather than request the Judicial Council of California to reassign the case to another Superior Court. Further compounding the situation, during the proceeding in the state court, Appellant's former counsel during the state court proceeding became Of Counsel to Stevens' counsel and Appellant expressed concern as to a possible breach of confidentiality of communications. Shortly thereafter, Appellant's former counsel was designated as a member of the Superior Court. To avoid the appearance of impartiality, Appellant moved the Superior Court to transfer the case to another superior court. Upon the grant of the motion to enforce, that request was dismissed summarily as moot.

Appellant recognizes that raising disqualification issues presents an uncomfortable and disliked situation. See; e.g., *Frausto v Legal Aid Society of San Diego Inc*., 63 F.2d 1324, 1327, Note 8 (9th Cir. 1977)[appellate courts do not look very favorably on attempts to impinge the integrity of judges].This is not the case where Appellant has moved for disqualification based on bias. It is where the state Presiding Judge *sua sponte*, entered her disqualification based on her conclusion that the applicable statute so required it, given that her pecuniary interests were involved. The problem relates to Appellant electing not to waive the disqualification. The request for waiver, Appellant submits, is unduly coercive with draconian choices: accept a waiver and worry that a subsequent adverse decision is not impartial; or, decline a waiver and worry that a

subsequent adverse decision is in retribution. The latter is compounded given that state law required the disqualified judge to query in open court Appellant as to his waiver intentions and compounded further as the sitting judge was also the Presiding Judge with supervisory authority over all the other judges.

The law has long recognized that "…the lure of lucre is very strong and judges ought to be prohibited from presiding over outcomes where they have a direct financial interest. *Del Vecchio v Illinois Department of Corrections*, 31 F.3d 1363, 1373. (7th Cir. 1994). Thus, Appellant elected to decline a waiver. Ultimately, Appellant maintains that the primary concern is to dispense justice. The disqualification of the Presiding Judge was on her motion.

Another factor driving both courts is that the proceedings between Appellant and Stevens, on the face of things, have lasted for seven long years. The courts desire to bring the matter to a conclusion, at any and all costs. However, just as no legislation may do so, Appellant submits that a federal court may not pursue its purposes at all costs. *Rodriguez v. United States*, 480 U. S. 522, 525–526 (1987).

**RELIEF REQUESTED**

Appellant requests the Court on an emergency basis to stay temporarily the effectiveness of the underlying Bankruptcy Court proceeding, pending the consideration of this motion, as is permitted by precedents. See *Kettle Range Conservation Group v U.S. Bureau of Land Management*, 150 F 3d 1083, 107-1088 (Reinhardt, J., concurring), and thereafter to continue the stay pending appeal of the Denial Order.

**CONCLUSION**

This Court should stay the underlying proceeding pending a hearing on the pending appeal. If it declines to do so, this Court should stay the proceeding for a reasonable period to allow Appellant to seek in a fair and orderly way a stay from the Circuit Justice and/or the full Supreme Court.

Respectfully submitted,

Booker T. Wade, Jr.
Appellant

October 28, 2014

25

## DECLARATION OF BOOKER T. WADE JR. AS TO IRREPARABLE HARM
Pursuant to FARP 8(a)(2)(B)

I, Booker T. Wade Jr., declare as follows:

1. I submit this declaration in support of my Motion for Stay, specifically, to attest to the harm that I would suffer if a stay is not granted and the judgment of the state court is executed upon.

2.     I am a 72 year old male, currently living principally on Social Security benefits.

3.     I reside at 605 Forest Avenue, Palo Alto, California. I purchased this residence in 2004 as my principal residence and have lived in it since then, excluding about one year when my mother lived her while receiving medical treatment before she expired.

4.     The Forest Street property is my principal place of residence and is my retirement home. It was acquired by me solely with all costs paid by me. My former fiancée moved from her private residence in Arizona and lived with for a short period. Upon the breakdown of our relationship she claimed an interest in the property. We entered into a property settlement agreement that required the property be sold and the proceeds divided with her getting 60% in consideration of her paying that same percentage of the carrying costs. Over a two year period, she never paid any amount toward the carrying costs and the appointed arbitrator ruled that she had forfeited her rights to any proceeds and the property need not be sold.

5.     Despite the arbitrator's ruling, the state court has ordered that I be ousted from the property, that title be transferred to her and that 100% of all proceeds be distributed to her.

6.     If I am ousted from the property, I will not have another place to live as I cannot afford to acquire another property. Neither do I have a sufficient enough credit rating to even rent alternative housing. An ouster would put me at safety and health risks.

   I declare under the penalties of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on [date] in [city, state].


October 28, 2014


Booker T. Wade Jr.

**Exhibit A**

Order Denying Emergency Ex Parte Motion for Stay and Motion to Compel Arbitration

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| IN RE BOOKER T. WADE JR.,<br><br>Debtor, | Case No.: 14-CV-03453-LHK<br><br>ORDER DENYING EMERGENCY *EX PARTE* MOTION FOR STAY AND MOTION TO COMPEL ARBITRATION |

Before the Court are two motions: first, an Emergency *Ex Parte* Motion for Stay ("Ex Parte Motion"), and second, a Motion to Compel Arbitration ("Motion to Compel"). Both are brought by Booker T. Wade, Jr. ("Appellant," "Debtor," or "Wade"). For the reasons stated below, the Court finds it lacks jurisdiction to hear Appellant's Motion to Compel and therefore DENIES both the Motion to Compel and the Ex Parte Motion.

## I.    BACKGROUND

This Court summarized the relevant background in its prior Order Denying Emergency *Ex Parte* Motion for Temporary Restraining Order, ECF No. 4, but reproduces it here for the convenience of the reader.

Appellant filed a pro se petition for Chapter 11 bankruptcy in Bankruptcy Court on January 22, 2013. Arlene Stevens ("Stevens"), who had a long-term business and personal relationship with Appellant, moved the Bankruptcy Court for relief from the automatic stay that results from the

1

According to the declaration of David Hamerslough, Stevens' state court counsel, the Settlement has been complied with in material respects by Stevens. Among other things, Stevens sold the real property located 3575 Tripp Road, Woodside, California, and deposited $620,000 in proceeds in a separate bank account, pending further order from the state court. Stevens also sold cellular licenses. Counsel is holding $176,000 in funds pending further order from the state court. 1010 Corporation Way, Palo Alto, California, was foreclosed by the lender representing the Small Business Administration before it could be sold. Debtor did not sell the real property at 605 Forest Avenue, Palo Alto, California. A broadcast license in Topeka, Kansas has not been sold because Debtor was not able to secure the right to sell it from co-owners. Debtor did not give Stevens a $300,000 promissory note.

Debtor has made several attempts to set aside the Settlement, generally based on perceived unfairness or a lack of impartiality on the part of Judge Jacobs-May or Judge Silver.

On May 7, 2009, the Superior Court granted Stevens' motion to enforce the Settlement. Debtor moved for a writ of mandamus in the California Court of Appeals but that court denied the writ in an order dated December 2, 2009. The California Supreme Court denied Debtor's petition for review.

On August 26, 2009, Debtor moved to vacate the Settlement. On November 10, 2009, the Superior Court denied that motion.

On April 19, 2010, Debtor again moved the Santa Clara Superior Court to vacate the Settlement. The motion was denied by an order docketed on June 17, 2010. The Court of Appeals denied Debtor's petition for a writ of mandamus on September 17, 2010.

See Bankr. Case No. 13-50376-SLJ, ECF No. 71 (footnotes and headings omitted).

The Bankruptcy Court denied the Motion to Reject Executory Contract and granted the

Motion to Lift the Stay, thereby allowing Stevens' state court actions against Appellant to proceed.

The state court entered its judgment resolving the actions on June 13, 2014. ECF No. 3, Ex. 4. That

judgment resolved a number of disputes regarding the settlement agreement, including the

requirement that Appellant immediately transfer the property located on Forest Avenue ("the Palo

Alto Condo") to Stevens and that Appellant vacate the Palo Alto Condo within 30 days. Id.

Meanwhile, on May 6, 2014, Appellant moved the Bankruptcy Court to compel Stevens'

counsel to turn over property of the estate stemming from the sale of a property unrelated to the

Palo Alto Condo. The Bankruptcy Court denied this motion. It is from the Bankruptcy Court's

United States District Court
For the Northern District of California

3

United States District Court
For the Northern District of California

1   error of that determination"); *Forever Green Athletic Fields, Inc. v. Dawson*, 514 B.R. 768, 782

2   (E.D. Pa. 2014) ("Further, any issue not raised in the Bankruptcy Court is deemed waived and we

3   may not consider it on appeal.").

4         With respect to a request to stay an order or judgment, "[a] motion for a stay of the

5   judgment, order, or decree of a bankruptcy judge . . . or for other relief pending appeal must

6   ordinarily be presented to the bankruptcy judge in the first instance." Fed. R. Bankr. P. 8005. A

7   party seeking a stay must satisfy each of the following elements: "1. Appellant is likely to succeed

8   on the merits of the appeal. 2. Appellant will suffer irreparable injury. 3. No substantial harm will

9   come to appellee. 4. The stay will do no harm to the public interest." *In re Yeganeh*, No. 06-2788,

10  2006 WL 1310447, at *4 (N.D. Cal. May 12, 2006) (citing *In re Wymar*, 5 B.R. 802, 806 (9th Cir.

11  1980)).

12  **III.   DISCUSSION**

13      **A.   Motion to Compel**

14        Appellant's Motion to Compel effectively asks this Court to order the parties to enter into

15  arbitration, pursuant to the binding arbitration provisions that Appellant contends are within the

16  settlement agreement.[2] However, appellant does not appear to have properly presented this

17  argument to the Bankruptcy Court. Appellant has not filed a motion to compel arbitration in the

18  Bankruptcy Court. The Bankruptcy Court's order that Appellant challenges does not indicate that

19  the issue was argued or decided. *See* ECF No. 1. Nor does the transcript from the hearing that

20  preceded the Bankruptcy Court's order reflect that either party raised the issue. *See* Bankr. Case

21  No. 13-50376-SLJ, ECF No. 183. Nor did Appellant discuss this issue in his moving papers. *See*

22  Bankr. Case No. 13-50376-SLJ, ECF No. 126. Appellant does refer to the arbitration clause in his

23  reply papers, but this is insufficient to deem the matter properly raised before the Bankruptcy

24  Court, for two reasons. First, a party cannot raise an issue for the first time in its reply brief. *In re*

25  *Kelly*, 499 B.R. 844, 863 (S.D. Cal. 2013) (issue raised for first time in reply brief on appeal from

26

27  _____

    [2] This is not the first time that the Appellant has sought this result. Appellant's Emergency *Ex Parte*
    Motion for Temporary Restraining Order essentially argued that the arbitrator, rather than the state
28  court, should have resolved disputes regarding the settlement agreement. *See* ECF No. 4, at 4.

5

1    (2009)). In other words, a federal court must have an independent basis for jurisdiction—either

2    because the matter involves a question of federal law, or because it involves diverse parties—to

3    issue a stay pursuant to the FAA. That is simply not the case here.

4      **B.**  **Ex Parte Motion**

5      Appellant did not present his motion for stay before the Bankruptcy Court and therefore it

6    was procedurally improper to raise it here. *See* Fed. R. Bankr. P. 8005. In addition, because the

7    Court does not have jurisdiction over Appellant's underlying Motion to Compel, the Court finds

8    that Appellant is unlikely to succeed on the merits of his motion, and therefore the requirements

9    necessary for a court to grant a motion for stay are not satisfied. *See In re Yeganeh*, No. 06-2788,

10   2006 WL 1310447, at *4.

11   **IV.**  **CONCLUSION**

12     For the foregoing reasons, the Court DENIES Appellant's (1) Emergency *Ex Parte* Motion

13   for Stay and (2) Motion to Compel Arbitration. The Court also notes that Appellant, in his filings

14   before this Court and the Bankruptcy Court, has shown a proclivity to re-litigate issues previously

15   settled by his agreement with Stevens. The Court reminds Appellant that his right to appeal the

16   decisions of the Bankruptcy Court to this Court does not give him license to try to re-litigate every

17   issue related to his settlement with Stevens, or the underlying judgment of the state court.

18

19   **IT IS SO ORDERED.**

20   Dated: October 9, 2014

            *Lucy H. Koh*

21              LUCY H. KOH

           United States District Judge

22

23

24

25

26

27

28

Case No.: 14-CV-03453-LHK
ORDER DENYING EMERGENCY *EX PARTE* MOTION FOR STAY AND MOTION TO COMPEL
ARBITRATION

United States District Court
For the Northern District of California

**Exhibit B**

Notice of Appeal

Booker T. Wade Jr.
605 Forest Avenue
Palo Alto, CA 94301
415 378 6250

In Pro Per

**UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION**

**In re**                                                    **Case No. 14-CV-03453-LHK**

**Booker T. Wade Jr.**

        **Debtor-Petitioner**

_____

**NOTICE OF APPEAL**

    Booker T. Wade, Jr., Debtor and Petitioner herein, hereby appeals to the United States Court of Appeals for the Ninth Circuit from the final order of the District Court for the Northern California, entered in this case on October 9, 2014, entitled "Order Denying Emergency Motion for Stay and Motion to Compel Arbitration," a copy of which is attached.

    The parties to the order appealed from, and the names and addresses of their respective attorneys, are set out in the attached proof of service.

                          Respectfully submitted,

                          _____
                          Booker T. Wade Jr.

October 22, 2014

CERTIFICATE OF SERVICE

1

2    ECF

3

4    Counsel for Arlene Stevens

5    David Hamerslough
     Rossi Hamerslough Reich & Chuck
6    1980 The Alameda Suite 200
     San Jose, CA 95126
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Exhibit C**

Reporter's Transcript of Settlement Agreement

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SANTA CLARA

BEFORE THE HONORABLE JAMIE JACOBS-MAY, JUDGE

DEPARTMENT NO. 4

---oOo---

ARLENE STEVENS, SUNGILT )
CORPORATION and TV-32 DIGITAL )
VENTURES, INC., )
                )
       Plaintiffs, )
                )
       vs. )      Case No. 1-07-CV-090284
                )
COOPER-FOWLER MEDIA COMPANY, )
MINORITY TELEVISION PROJECT, )
INC., GREG TALLEY, SHEILA )
ROBERTSON TALLEY and BOOKER T. )
WADE, JR., )
                )
       Defendants. )
_____ )
                )
AND RELATED CROSS-ACTION. )
_____ )

---oOo---

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Wednesday, January 21, 2009

VOLUME I of II — Pages 1 - 67

---oOo---

A-P-P-E-A-R-A-N-C-E-S:

FOR THE PLAINTIFFS:           DAVID M. HAMERSLOUGH and
                             STEPHEN S. FRY,
                             Attorneys at Law

FOR THE DEFENDANTS:           JAMES E. TOWERY and
                             NATASHA M. PARRETT,
                             Attorneys at Law

OFFICIAL COURT REPORTER:     PATRICK CROWLEY, CSR 11271
                             RPR, CRR 846186

2

1   San Jose, California                    Afternoon Session

2                       PROCEEDINGS

3           THE COURT: Okay. We're on the record in the

4   matter of Stevens versus Wade, 1-07-CV-090284. There are

5   related matters. There was a related case in San Mateo, and

6   this case is resolving that because that has to do with a

7   partition of Woodside, right?

8           MR. TOWERY: They've been coordinated.

9           THE COURT: Here?

10          MR. TOWERY: Three actions have been coordinated

11  in this number.

12          THE COURT: Okay, so the --

13          MR. TOWERY: And I don't -- I don't have the other

14  case numbers.

15          THE COURT: Well, there are three actions. One's

16  this Woodside action and another is a domestic violence

17  action. And the domestic violence action is both -- is it

18  the restraining order or is it the personal injury for the

19  domestic violence?

20          MR. HAMERSLOUGH: It's -- all of that is being

21  carved out.

22          THE COURT: Okay, so the first thing we're going

23  to do is get appearances for Ms. Stevens, first of all.

24          MR. HAMERSLOUGH: Dave Hamerslough.

25          MR. FRY: Stephen Fry.

26          THE COURT: And, Ms. Stevens, I need your name for

27  the record.

28          MS. STEVENS: Arlene Stevens.

COPYING PROHIBITED PURSUANT TO GOV. CODE 69954(d)

3

```
1           THE COURT:  And for Mr. Wade.

2       MR. TOWERY:  James Towery.

3       MS. PARRETT:  Natasha Parrett.

4       THE COURT:  And?

5       MR. WADE:  Booker Wade.

6       THE COURT:  And we've been at this for about two

7  and a half days.  I'm going to start announcing the terms of

8  the agreement for the record.  If I say anything wrong,

9  interrupt me right away -- don't wait -- so we get it right.

10 If I leave anything out, at the end of this tell me what it

11 is so we can get it on the record.

12          At the end of this record, I'm going to ask the

13 two parties three questions:  Did you understand everything

14 I said; do you have any questions; do you agree to these

15 terms and conditions -- four questions -- and do you want me

16 to make this a court order?  And when I hear yes to all

17 that, it's binding.

18          If at the end of all this there's a dispute about

19 what we agreed to, I get this transcript and this transcript

20 controls.  So, if you end up drafting a written agreement or

21 not, you end up fighting about what did we agree to, I go

22 back to this transcript and this transcript controls.

23          I guess the first thing I want to say is let's

24 just talk about -- there are a number of cases; they're

25 coordinated.  This case is not resolving the domestic

26 violence cases in any respect.  So, my understanding is

27 there may be issues about restraining orders; there may be

28 issues about personal injury involving domestic violence.  I
```

4

1   think there are claims and cross-claims, meaning each party

2   has asserted claims against the other. This case is not

3   resolving anything that has to do with domestic violence or

4   personal injury resulting from domestic violence.

5           MR. TOWERY: Your Honor, the way that I would

6   suggest we phrase that is -- we've been discussing among

7   counsel -- is that the causes of action in the respective

8   second amended complaint, first amended cross-complaint

9   related to intentional torts and/or domestic violence are

10  severed. And so those causes of action are in this

11  complaint right now, but we're severing them in this

12  complaint -- this settlement leaves those unresolved.

13          THE COURT: Intentional tort is too broad. So,

14  there may be causes of action for fraud or deceit or

15  whatever, and we are resolving those. So, let's just stick

16  to the gravamen, which is domestic violence, which leads to

17  a restraining order. And what I understand is domestic

18  violence is also known as battery and assault, meaning

19  physical touching that leads to personal injury. So,

20  anything arising out of notions of this physical touching

21  are carved out.

22          MR. HAMERSLOUGH: Right. And, for example, when

23  we were talking today up in Judge Cabrinha's department, we

24  were talking about, you know, the police officers, the

25  police reports, you know, doctors, you know, the medical

26  issues, those sorts of things, Judge.

27          THE COURT: So, those are not being settled. So,

28  now we've talked about what's not being settled. The second

COPYING PROHIBITED PURSUANT TO GOV. CODE 69954(d)

5

1  thing I want to say is the Court -- I mean, strike that.

2  The parties have asked the Court --

3          MR. TOWERY:  That would include -- what's not

4  being resolved is the malicious prosecution.  That was

5  alleged out of all of those incidents in the August of '07,

6  so that is severed and set aside as well.

7          THE COURT:  Okay.  So, if you're talking about

8  malicious prosecution arising from domestic violence claims,

9  that's fine.

10         MR. TOWERY:  That's what's pled, and --

11         THE COURT:  Then that is also not being resolved.

12  So, the things arising out of the domestic violence claims,

13  whether they're claims for a restraining order, claims for

14  personal injury or claims that were brought improperly and

15  are subject to a malicious prosecution case are not being

16  resolved.

17         The parties have asked the Court to retain

18  jurisdiction under CCP Section 664.6, which is the one that

19  says if you have disputes about what this agreement is and

20  you need a Court to help enforce this quickly and by motion

21  only and not by filing a whole new lawsuit, that code

22  section allows me to do that, and that's part of this

23  agreement.  I will do that.

24         The next thing is that -- I'm going to talk about

25  real property next.  There are three pieces of real property

26  that are in dispute with the -- between the parties.  One we

27  call Woodside because it's located in Woodside.  Does

28  somebody have the address?

COPYING PROHIBITED PURSUANT TO GOV. CODE 69954(d)

6

1         MR. HAMERSLOUGH: Tripp, T-r-i-p-p, Road.

2         MS. STEVENS: 3575.

3         MS. PARRETT: 3575.

4         THE COURT: 3575 Tripp Road. That's the Woodside

5 address. One is 1010 Corporate Way in --

6         MS. STEVENS: Corporation.

7         THE COURT: Corporation Way in?

8         MS. STEVENS: Palo Alto.

9         MR. HAMERSLOUGH: Palo Alto.

10         THE COURT: And the third is a condo in Palo Alto.

11         MS. STEVENS: 605 Forest Avenue.

12         MR. HAMERSLOUGH: Forest Avenue.

13         THE COURT: Okay. Those are the three pieces of

14 property, real property. This is what's happening to them.

15 The Wood -- and, number one, the parties represent as true

16 that none of these pieces of property have encumbrances,

17 leases or options other than those disclosed in discovery.

18 Is that a good way of saying it? In other words, they all

19 are encumbered. One at least has a lease, but I assume --

20         MR. HAMERSLOUGH: Well, my understanding is that

21 Woodside has a loan with Washington Mutual.

22         MR. FRY: That's correct. I mean, we could break

23 it down individually by property.

24         THE COURT: Do you want to just state what it is

25 then? So, Woodside has a loan at Washington Mutual put on

26 some time ago, long before this lawsuit was filed, right?

27         MS. STEVENS: Mm-hm, yes.

28         MS. PARRETT: Correct.

COPYING PROHIBITED PURSUANT TO GOV. CODE 69954(d)

7

1    THE COURT:  And that's the only loan on it, and

2  that's the representation being made; is that accurate,

3  Mr. Wade?

4    MR. WADE:  It is.

5    THE COURT:  Okay.  The Palo Alto condo --

6    MR. WADE:  In connection with the bailout, it may

7  not be actually Washington Mutual.  But originally --

8    MR. FRY:  Right.

9    MR. WADE:  -- it was Washington Mutual.

10    THE COURT:  In other words, Washington Mutual may

11  have morphed having to do with another company, but it's the

12  same loan.

13    MR. WADE:  It's originated there, yes.

14    THE COURT:  You haven't done anything more.

15    MR. WADE:  That is correct.

16    THE COURT:  Okay.  The Palo Alto condo has a loan

17  from where?

18    MR. WADE:  Chase Manhattan.

19    THE COURT:  And --

20    MR. HAMERSLOUGH:  Is it just a first?

21    MR. WADE:  Only a first.

22    MR. FRY:  So, the second was paid off during one

23  of the refinances?

24    MR. WADE:  At acquisition.  There was a first and

25  a second.

26    MR. FRY:  Correct.

27    MR. WADE:  Both with the same company.  First

28  refinance was consolidated into a first.

COPYING PROHIBITED PURSUANT TO GOV. CODE 69954(d)

8

1          MR. FRY:  Okay.

2          MR. WADE:  There's no second.

3          MR. HAMERSLOUGH:  And what is the approximate

4   amount of that encumbrance at this point?

5          MR. WADE:  556, I believe, thousand.

6          MR. FRY:  Okay.

7          THE COURT:  Okay, and then the third piece of

8   property, 1010 Corporation Way, has an encumbrance in the

9   amount -- with what bank, first of all?

10         MR. FRY:  It's got a first with Sonoma National

11  Bank.

12         THE COURT:  Okay, and a second?

13         MR. FRY:  Well, the second is administered through

14  -- is it Colson?

15         MS. STEVENS:  Mm-hm.

16         MR. FRY:  C-o-l-s-o-n.

17         THE COURT:  And the total encumbrance

18  approximately?

19         MR. FRY:  Hold on a second.  First loan I have

20  with Sonoma National Bank is approximately $2,023,750, and

21  the information I have is that the second loan administered

22  through Colson has an approximate principal amount of

23  $1,416,625.

24         THE COURT:  Okay, so since you put those loans on

25  which predated this lawsuit, in fact more has been put on;

26  is that correct?

27         MS. STEVENS:  That's correct.

28         THE COURT:  Is that correct, Mr. Wade?

9

1         MR. WADE:  That's correct.

2         THE COURT:  And my understanding also is that

3 these loans, maybe both of them, were personally guaranteed

4 by Ms. Stevens.  Is that correct, Ms. Stevens?

5         MS. STEVENS:  That's correct.

6         THE COURT:  And you understand that to be true,

7 too; is that correct, Mr. Wade?

8         MR. WADE:  I'm not sure.

9         THE COURT:  Okay, so I'm assuming that it's true.

10        MS. STEVENS:  Okay.

11        THE COURT:  And for purposes of settlement, we're

12 assuming it's true because certain things will follow from

13 that.

14            So, the first thing I want to say is the Woodside

15 property, by virtue of the settlement, will become the sole

16 and exclusive property of Ms. Stevens.

17            The 1010 Corporation Way property will become the

18 sole and exclusive possession of Mr. Wade.

19            And the Palo Alto condo will -- even though -- and

20 this is true no matter how the title now exists -- will be

21 shared by both parties, 60 percent Ms. Stevens, 40 percent

22 Mr. Wade.

23            MR. HAMERSLOUGH:  Your Honor, I just want to make

24 -- ask for one clarification on something.  I just want to

25 make sure that as to all three properties, there are, as you

26 mentioned, no options, no rights of first refusal, there are

27 no leases.

28            MR. FRY:  Any third party commitments or

10

1  obligations.

2        THE COURT:  Well, there are --

3        MR. HAMERSLOUGH:  That's exactly -- Mr. Wade has

4  identified something that I'm concerned about.

5        THE COURT:  What -- Mr. Wade, what --

6        MR. WADE:  I have permitted my neighbor to board

7  horses on the property on 30 days notice.

8        MR. HAMERSLOUGH:  So, do you have a written

9  document?

10       MR. WADE:  No.

11       MR. HAMERSLOUGH:  Or is it oral?

12       MR. TOWERY:  It's just oral.

13       MR. HAMERSLOUGH:  I just think we need some

14  provision in this that in the event that we have some issue

15  about that, we can come into court and try to deal with it.

16  That's why I'm asking these questions.

17       THE COURT:  Okay, and just so that everybody

18  understands how I would handle this because I don't want

19  anybody to be surprised, the way I would handle it if either

20  of you ended up having a problem with a third party because

21  you did something, I would be requiring you to take care of

22  the problem.

23       So, hypothetically, if your neighbor said I'm not

24  moving my horses, and Ms. Stevens to sell the property had

25  to take court action and hire a lawyer or do whatever, I

26  would make sure that you paid for it, Mr. Wade, and vice

27  versa.  If Ms. Stevens did something with any property that

28  caused you a problem and you to incur expenses to fix the

11

1   problem she caused, I would make her pay for it.

2          So, the idea is that you're offering up this

3   property with only the encumbrances that we've identified.

4   And if there are any additional problems, each of you are

5   going to be responsible for fixing those problems.  So, I

6   just want everyone to know that that's the agreement we're

7   entering into.

8          MR. TOWERY:  At some point in time I want to talk

9   about how we're going to accomplish what you just said.

10         I know you have other provisions that you need to

11  discuss, but there's an issue that we need to address in the

12  settlement agreement.  The two residences can be handled by

13  deeds, the transfer of property as provided for in the

14  settlement.

15         1010 Corporation Way is more complicated because

16  title to that is held in the name of a corporation,

17  Television-32 Digital Venture.  Therefore, what we believe

18  is appropriate -- it's never been discussed with you or with

19  counsel.  What we believe is appropriate is that what we're

20  discussing here is a transfer of the corporation to Mr. Wade

21  so that he will be the owner.

22         THE COURT:  Well, you don't need a transfer of the

23  corporation.  You just need the corporation to issue a

24  transfer of the deed.

25         MR. TOWERY:  Well, but we don't think the

26  corporation has any other assets, and --

27         THE COURT:  So --

28         MR. TOWERY:  And there may be problems with the

COPYING PROHIBITED PURSUANT TO GOV. CODE 69954(d)

12

1   lender. That's what I'm saying. To change it from a

2   corporate ownership to a sole ownership, we'd rather leave

3   the corporate ownership and transfer ownership of the

4   corporation. If there's a reason not do that, we'd love to

5   hear that, but we can't think of any. But we would like it

6   to be addressed today before we leave here.

7        THE COURT: Do you want to talk to your client for

8   a second?

9        MR. HAMERSLOUGH: No. I need to discuss the tax

10   ramifications of that with Mr. Thompson. One of the issues

11   we've talked about is that any ongoing expense or obligation

12   including taxes is going to be split, you know, pursuant to

13   a percentage or pursuant to who owns the property.

14        But to the extent that we're now talking about

15   structuring transfers of title, you know, based on corporate

16   ownership or not, there's some tax ramifications. I can try

17   to get Mr. Thompson on the phone. I think -- why don't we

18   get through the rest of this?

19        THE COURT: Okay. Let's -- let's park that and

20   say we need a resolution about how.

21        MR. TOWERY: Am I correct on Woodside? However

22   it's going to happen, it's going to be a quit claim deed

23   from Booker to Arlene? I mean, that's the way to accomplish

24   -- there will be --

25        MR. HAMERSLOUGH: You know what --

26        MR. TOWERY: -- tenants in common right now, so it

27   needs to be changed.

28        MR. HAMERSLOUGH: It does. And the only issue is

COPYING PROHIBITED PURSUANT TO GOV. CODE 69954(d)

13

1  whether that triggers, you know, any potential reassessment

2  or not. We want to cooperate. That's the underlying goal

3  here, and so I think what I would prefer to do is let's talk

4  about what the concepts are, and then let's see -- you know,

5  I will be glad to go back to the office and talk to

6  Mr. Thompson.

7  　　　　THE COURT: This is what we can agree on, and this

8  is what I suggest; and hopefully you'll trust me, and I'll

9  tell you how and make a decision. Things don't necessarily

10 have to be transferred by title because if it's going to

11 trigger a reassessment and cause the parties more, cost more

12 money, they're not going to want to do it. But really what

13 we're getting to is a liquidation.

14 　　　　So, as I understand it, although I might be wrong,

15 but if the parties want to sell a piece of property, for

16 example, Palo Alto, it may be better not to transfer

17 ownership if transference of ownership would trigger a tax

18 consequence; and instead just do what we're intending to do,

19 which is from the net proceeds -- the net proceeds. So,

20 first you pay off the commission and the pay off the fees

21 and all of that, and what's left over is split 60/40, 40 to

22 Mr. Wade, 60 to Ms. Stevens.

23 　　　　Now, if it turns out that there's a liability, it

24 didn't fetch -- it fetched less than what was owed, it would

25 be paid 60/40; 60 Stevens, 40 Wade.

26 　　　　MR. TOWERY: Except that we're dealing with two

27 residences, both of which have purchase money mortgages on

28 it. There shouldn't be any deficiency payable by anybody.

14

1        THE COURT:  Well, and that's a good point, too.
2   But so --
3        MR. HAMERSLOUGH:  Not necessarily.  Let's not get
4   bogged down in that.  I mean, if he refi-ed, that wouldn't
5   be the case.
6        THE COURT:  But the point is that -- the point is,
7   is that if there is a dispute about how to do it and ~~~~~~~~
8   ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
9   ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
10  ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
11       But if I have to do it because it's legally
12  required or because someone doesn't want to sell property,
13  they want to keep it as in~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
14  ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
15  ~~~~~~~~~~  But otherwise I'm trying to maximize the amount
16  of money that's left in the parties' pockets, okay?
17       And I think I can do that, for example, with Palo
18  Alto because I think what's underlying this whole settlement
19  is just trying to maximize dollars to the parties as opposed
20  to caring about an interest in property, okay?  Do you
21  understand what I'm saying?
22       MS. STEVENS:  Yes.
23       THE COURT:  Okay.  All right, so going through it,
24  the Woodside piece of property is going to be owned by
25  Ms. Stevens.  Ms. Stevens, as I understand it, is going to
26  sell it.  If she does sell it, all the proceeds go to her.
27  If she doesn't sell it, she's responsible for the ongoing
28  costs.

COPYING PROHIBITED PURSUANT TO GOV. CODE 69954(d)

15

1       And then we'll pick a start date in a second for

2  when all this starts.  I mean, should we start it February

3  1st?  Should we start it today?  You tell me when you want

4  to start it.

5       MR. HAMERSLOUGH:  I think we ought to start it as

6  of where we are right now.

7       THE COURT:  Today?

8       MS. STEVENS:  Can we talk about that?

9       THE COURT:  So -- all right, so we'll talk for a

10  second.  We'll park that for a second.  That's Palo Alto

11  we're splitting 60/40 and 1010.

12       My understanding is that it's going to be put up

13  for sale immediately; that beginning today or whatever start

14  date we figure out, Mr. Wade would be fully responsible for

15  the carrying costs, utilities, everything that goes along

16  with ownership.

17       That unlike the Woodside and Palo Alto pieces of

18  property, Ms. Stevens has guaranteed 1010, and she's on the

19  hook for $3.5 plus million.  And so the attorneys are going

20  to meet and confer.  They're going to try to agree on the

21  details involved in selling, who -- you know, who they

22  should engage to be the listing broker, what should be the

23  purchase price, those kinds of things.

24       If you can't agree, the parties agree to go to

25  Judge Silver, and he'll act as an arbitrator.  He may act

26  trying to get the parties to agree; but if you can't agree,

27  he'll just make the call, and you folks will live with the

28  call.  And that's true about the two pieces of property that

COPYING PROHIBITED PURSUANT TO GOV. CODE 69954(d)

16

1  have to be sold, which is 1010 and Palo Alto. If you have a

2  dispute, you're going to go to Silver.

3       In terms of -- and both of you are going to be

4  agreeing on the methodology of selling Palo Alto because you

5  own it 60/40 and 1010. Because even though Mr. Wade owns

6  it, Ms. Stevens is on the hook personally if she can't get

7  out of it.

8       If before the time for sale happens, before the

9  time you enter into a contract with someone to buy it, you

10  are able to get Ms. Wade -- Ms. Stevens off the guarantees,

11  then you're free to do whatever you want to with the

12  property. So, that if some -- you were able to convince the

13  lender to release her from the guarantee or able to refi it,

14  your obligations are complete. That's the key for

15  Ms. Stevens is being released of the liability.

16       If when you sell it, you sell it for more than the

17  encumbrance, you get to keep the money. If when you sell

18  it, you sell it for less the encumbrances and there's a

19  deficiency because Ms. Wade is on the hook for that --

20       MR. HAMERSLOUGH: Ms. Stevens.

21       THE COURT: Ms. Stevens is on the hook for it,

22  Mr. Wade is obligated to pay that amount of money. In other

23  words, it's not Ms. Stevens' burden. It's Mr. Wade's burden

24  to pay any deficiency in 1010, just like it's his -- he gets

25  the benefit of ownership, but he also gets the detriment of

26  ownership. So, that's the property.

27       In terms of --

28       MR. HAMERSLOUGH: And may we -- I'm sorry, Your

COPYING PROHIBITED PURSUANT TO GOV. CODE 69954(d)

17

1  Honor.  May we make a point?

2        THE COURT:  Yes.

3        MR. HAMERSLOUGH:  I'm going to use the term

4  security or collateral.

5        THE COURT:  I'm going to do that in a second.

6        MR. HAMERSLOUGH:  I'm sorry.

7        THE COURT:  You have something to say?

8        MR. TOWERY:  Yes.  Although none of us anticipate

9  any deficiency on Woodside because it's a purchase money

10  mortgage, if for any reason there is a deficiency, I assume

11  the mirror image principle would apply.

12        THE COURT:  Meaning -- and that's true about Palo

13  Alto, too.

14        MR. TOWERY:  Yeah.

15        THE COURT:  So, Palo Alto would be 60/40.

16  Woodside would be --

17        MR. TOWERY:  In effect, each party is indemnifying

18  the other if there is any deficiency on the property.  We

19  don't expect there to be any on either the residential

20  properties.  It's only a real risk with respect to 1010, but

21  because we can't foresee everything, if it turns out there

22  is a deficiency on any of the others --

23        THE COURT:  And we have to define what deficiency

24  means.  To me, deficiency does not mean the purchase price

25  of the property was less than the mortgage.

26        MR. TOWERY:  No, not a short sale; you're correct.

27        THE COURT:  Right.  To me, a deficiency means the

28  bank has a right to collect that difference from the parties

COPYING PROHIBITED PURSUANT TO GOV. CODE 69954(d)

18

1  that took out the loan.

2          MR. TOWERY:  The way that I would suggest we

3  phrase it is if either party suffers a financial loss as a

4  result of the sale of the property, then the other party

5  indemnifies them for the full amount of that financial loss,

6  so it's not a short sale.

7          MR. HAMERSLOUGH:  Well, it's clearly not a short

8  sale because that would require, you know, lender approval.

9  I agree that if Ms. Stevens sells Woodside and there is

10  insufficient funds to cover the loans, that she is then

11  responsible for dealing with that aspect financially, as is

12  Mr. Wade.

13          THE COURT:  Actually, I'm saying something not

14  quite that strong.  What I'm saying is if the sale of the

15  property does not cover the loans, Ms. Stevens is still not

16  responsible for anything because it's a purchase money

17  mortgage.  And my understanding --

18          MR. HAMERSLOUGH:  Got it.

19          THE COURT:  Understanding of it is that the lender

20  can only look to the value of the property for their loans.

21          But if for some reason I'm wrong about that or

22  they signed some document or they -- the lender contends

23  somehow that a person is individually responsible,

24  Ms. Stevens would only be responsible for any loss to

25  Mr. Wade if indeed there was a loss.

26          MR. HAMERSLOUGH:  I appreciate the distinction and

27  I accept it.

28          THE COURT:  Okay.

COPYING PROHIBITED PURSUANT TO GOV. CODE 69954(d)

19

1          MR. TOWERY:  Yeah.  We accept it, too.  I also

2     want to be heard on the effective date of this

3     responsibility of the real property.  I don't know when --

4          THE COURT:  We're going to -- we haven't talked

5     about it yet.  We'll get there.

6          MR. TOWERY:  Okay.

7          THE COURT:  Now, the next thing is -- the next

8     thing I want to talk about is there's equipment, and the

9     equipment is going to be owned by -- off the record.

10              (Whereupon, a discussion was had off the

11         record.)

12         THE COURT:  All right, on the record.  There's

13    equipment.  Mr. Wade is going to take ownership of the

14    equipment.  Mr. Wade, in exchange for the ownership of the

15    equipment, is going to owe Ms. Stevens $300,000.  Whether

16    it's this note for $300,000 or the obligation under 1010 to

17    get her released from the $3.5 million guarantee, there is

18    other property that is going to secure those obligations.

19              And this other property that's going to secure

20    those obligations is the licenses.  So, the parties agree

21    that the three sell licenses, plus the Topeka license, are

22    going to be sold.  And the parties will again meet and

23    confer regarding the way to sell that property.

24              If they can't agree, that too will go to Judge

25    Silver for decision.  The sale of that property -- and we'll

26    call it the licenses, three sell and the Topeka license,

27    will be shared 70/30, 70 percent to Ms. Stevens, 30 percent

28    to Mr. Wade.

COPYING PROHIBITED PURSUANT TO GOV. CODE 69954(d)

20

1    Nobody -- once that stuff is sold, nobody can

2    collect money until whatever issue they have with respect to

3    the other party is resolved.  For example -- and I'll

4    explain it.  Ms. Stevens has Woodside.  You, Mr. Wade,

5    you've signed a loan on Woodside.  So, Ms. Stevens can't --

6    her 70 percent is going to sit in that account until that

7    debt is over and those issues are resolved.

8         In terms of you, until she is removed from the

9    $3.5 million problem and until your $300,000 note is paid

10   off, your 30 percent interest in this money is going to sit

11   in an account as security for those obligations.  Once the

12   $3.5 million guarantees are removed and once your 300,000

13   note is paid, you can get whatever the remainder is.  But

14   that money will sit there as security to pay for those

15   debts.

16        MR. HAMERSLOUGH:  And can we agree, Your Honor,

17   that we will cooperate and that money will be placed in some

18   interest-bearing account subject to Judge Silver's

19   authorization?

20        THE COURT:  Yes.

21        MR. TOWERY:  This is a material change from

22   anything we've heard before.

23        THE COURT:  No, I -- well, let me --

24        MR. TOWERY:  Because we've heard this applied to

25   the equipment.  We understood and agreed that this principle

26   would apply to the equipment, so that the obligation to

27   repay Ms. Stevens for the equipment was going to be secured

28   by the licenses; therefore, it followed --

COPYING PROHIBITED PURSUANT TO GOV. CODE 69954(d)

21

1          THE COURT:  If that's true, then it's my apology

2    because I wasn't able to make it clear enough.  It was

3    always the -- it's my fault.  It was always what was

4    intended.  So, do you need a chance to talk?

5          MR. TOWERY:  Well, I mean, let me just surface the

6    issue.  What I would like to do is to build a mechanism into

7    this so that we can come back to you if necessary or Judge

8    Silver -- my preference would be you -- to apply for a

9    modification of this because I can see a circumstance where

10   the licenses are sold.  There's money there.

11         If the money could be released to Mr. Wade, then

12   Mr. Wade could do a work-out with the bank and get

13   Ms. Stevens off the guarantee for the bank loan.  But if

14   Ms. Stevens says you can't have access to the money, then

15   that would frustrate his ability to do a work-out.  And, I

16   mean, it would really -- it would be detrimental in the long

17   run to both parties.

18         THE COURT:  So, why don't we build this in, and

19   then we can figure out if it's me or Silver.  But I agree

20   with what Mr. Towery said, so let me just clarify it and

21   make it crystal clear.  This is important to listen to.  I

22   think it's very, very important for those assets to secure

23   obligations to Ms. Stevens, both the $300,000 loan and the

24   $3.5 million, no question.

25         What Mr. Towery is suggesting, which makes

26   perfectly good sense to me, is you standing before me and

27   say if you can only give me the $200,000, the bank will

28   release her from the $3.5 million.  And I did pay off the

COPYING PROHIBITED PURSUANT TO GOV. CODE 69954(d)

22

1  $300,000 note, so, come on, be rational, and I get that.

2        So, if I were convinced or Judge Silver were

3  convinced that a release of money would in fact satisfy your

4  obligations, that's what would happen. But if the release

5  of the money wouldn't, if it's, well, come on, let me just

6  carry it for two more months and then maybe they will,

7  there's no maybes here. There's no release of money for

8  maybes. It's got to actually do the trick.

9        MR. HAMERSLOUGH: Your Honor, I accept that an

10  application can be made with, you know, supporting evidence

11  in front of either you or Judge Silver, and we would be

12  given the time to, you know, look into it and evaluate it

13  and then --

14        THE COURT: But you're agreeing now, both of you,

15  to live with whatever decision either me or Judge Silver

16  makes. That's the point of this, that you're agreeing now.

17  And I'm trying my hardest to anticipate what would come down

18  the pipe and how would I decide it so you're not just you

19  buying into this blind.

20        MR. HAMERSLOUGH: Right. As long as, from our

21  perspective, the sale of those other media properties is

22  security or collateral for the payment of the $300,000 with

23  any accrued, you know, interest and principal. If they want

24  to pay us off out of proceeds, you know, then that's fine

25  with us.

26        We also want that to be security for their

27  obligation to carry the property and security for their

28  retiring us from Corporation Way's underlying loans.

COPYING PROHIBITED PURSUANT TO GOV. CODE 69954(d)

23

1        With respect to the equipment, certainly Mr. Wade

2   is going to be responsible for that.  If there are any

3   guarantees or other security interests relative to that

4   equipment, you know, that would be his obligation because

5   he's receiving it.  The terms of the note I think haven't

6   been stated.

7        THE COURT:  You have to state it because I can't

8   remember what they are.

9        MR. HAMERSLOUGH:  It was payable at seven percent

10  due.

11       MR. TOWERY:  Seven percent fully amortized as if

12  it were a seven-year note, but payable with a balloon

13  payment in three.  So, it would be principal/interest

14  payments from the first month over a seven-year amortization

15  schedule.

16       MR. HAMERSLOUGH:  And what does that calculate out

17  to per month?

18       MR. TOWERY:  Haven't done the calculation.

19  Mr. Thompson, Ms. Wade [sic.] could do the calculation for

20  us.

21       THE COURT:  So, that if you choose not to pay it

22  out, that money's going to sit there for at least three

23  years.  If you choose not to pay off the note at a minimum,

24  that money's --

25       MR. WADE:  Can we make it proportional?

26       THE COURT:  No, no.  I'm just telling you that

27  enough money has to be in that -- assuming hypothetically

28  you retired a $3.5 million debt, enough money has to stay in

COPYING PROHIBITED PURSUANT TO GOV. CODE 69954(d)

24

1   that account to pay off whatever it is that you owe.

2         MR. TOWERY: So, if by way of example the time the

3   licenses are sold he's paid 120,000 on the note and there's

4   180,000 principal remaining, then you owe a hundred -- if he

5   doesn't use the 180,000 to cash her out, 180 would stay in

6   the interest-bearing account as security for her.

7         THE COURT: Right, and --

8         MR. TOWERY: Not 300,000 but the amount remaining

9   unpaid on the note.

10        THE COURT: Right. And even if he paid off the

11   note, if the 3.5 still existed, the money has to stay there

12   to secure the 3.5.

13        MR. TOWERY: Understood.

14        THE COURT: All right.

15        MR. HAMERSLOUGH: And what remedy is there in the

16   event that a monthly payment is not made on the note?

17        THE COURT: I think it should come out of the -- I

18   mean, I think --

19        MR. TOWERY: You can have a security interest.

20        MR. HAMERSLOUGH: Well, there's got to be some

21   sort of a penalty or something.

22        THE COURT: Why don't we just -- why don't we just

23   say both of you are right, and my suggestion is that that

24   monthly payment come out of his share of that money. So, it

25   doesn't accelerate it, but she gets her monthly share. She

26   will always be guaranteed a monthly share. And if he gets

27   tired of paying interest, he'll pay the whole thing over.

28        MR. HAMERSLOUGH: Right, but we're counting on

COPYING PROHIBITED PURSUANT TO GOV. CODE 69954(d)

25

1   that income.

2          THE COURT:  You're going to get it out of that

3   account.

4          MR. HAMERSLOUGH:  Out of which account?  I'm

5   sorry.

6          THE COURT:  The equipment security account.

7          MR. HAMERSLOUGH:  Correct, but if the --

8          THE COURT:  You'll get the monthly payment out of

9   it.

10         MR. HAMERSLOUGH:  What happens if it just isn't

11  made and the equipment security account doesn't produce any

12  money because the licenses don't sell quickly?

13         THE COURT:  Oh, I see what you're saying.

14         MR. HAMERSLOUGH:  And all of a sudden we're

15  waiting ten months for our, you know, monthly payment;

16  there's got to be some penalty for not making a payment.

17         THE COURT:  What do you suggest?  My suggestion

18  would be when those licenses sell, Ms. Stevens is entitled

19  to the interest that is owed to her over that period of time

20  and be paid in full.  So, if he makes no payments for ten

21  months and then the tenth month the equipment sells, she's

22  entitled to ten months of interest, plus the $300,000.

23         MR. HAMERSLOUGH:  Well, no.  I mean, that --

24  there's no penalty in that.  There won't be a payment, and

25  they'll just say, fine, the interest is accruing.  There's

26  no motivation to pay.

27         MR. FRY:  That's an acceleration clause, which is

28  fine.  And there should be an acceleration clause associated

COPYING PROHIBITED PURSUANT TO GOV. CODE 69954(d)

26

1   with any default upon Mr. Wade's responsibility to pay on

2   the note.  But there also should be a penalty associated

3   with his failure to make a timely payment of, say --

4           MR. HAMERSLOUGH:  Otherwise, it's totally under

5   his control.

6           THE COURT:  What do you suggest?

7           MR. FRY:  15 percent.

8           MR. TOWERY:  15 percent what?

9           MR. FRY:  Late payment penalty, 15 percent of

10  whatever the amount due for that monthly payment.  So, for

11  instance, if it's $1400, it would be $210 as a late penalty

12  payment.

13          MR. TOWERY:  You know, I mean, Mr. Wade intends to

14  make these payments.

15          MR. FRY:  I understand.

16          MR. TOWERY:  We're putting him into a box for a

17  lot of reasons.  And we are setting up a situation in which

18  there's complete security that Ms. Stevens has to be paid

19  for the equipment because it's security out of his 30

20  percent of the licenses when they're sold.  We don't know

21  which order these things are going to be sold in.  If the

22  licenses are sold quickly, this is not going to be a

23  problem.

24          MR. HAMERSLOUGH:  All I'm asking is what if, given

25  the fact that we are relying on that income, she needs the

26  income?  I appreciate the dilemma, but there's got to be a

27  mechanism that we can think of -- why don't we do this at

28  this point, Your Honor.  Let's -- when we revisit the start

COPYING PROHIBITED PURSUANT TO GOV. CODE 69954(d)

27

1  date, maybe we can...

2         THE COURT:  Why don't we just do this.  There's,

3  number one, an acceleration.  So, when the money comes in,

4  it's paid and it's --

5         MR. TOWERY:  I think there ought to be some

6  incentive for Mr. Wade to make timely payments other than an

7  acceleration clause.  We don't -- it's not in anybody's

8  interest to drive him towards a bankruptcy proceeding.

9  That's the direction that we're headed if we're overly

10  punitive.

11         THE COURT:  Would you rather have a penalty than

12  an acceleration clause?

13         MR. TOWERY:  What comes to my mind immediately is

14  why don't we have a differential interest rate on the loan?

15  One interest rate, a lower interest rate if he's making

16  payments; and his penalty if he doesn't make timely payments

17  is a higher interest rate.

18         THE COURT:  Well, that's the same as -- this is my

19  suggestion.  My suggestion is that it does have an

20  acceleration clause.  And if he misses a payment, it will be

21  a hundred dollar late fee.

22         MR. TOWERY:  Okay, that's fine.

23         MR. HAMERSLOUGH:  I need to talk to my client

24  about this.

25         THE COURT:  Go ahead.

26             (Pause in proceedings.)

27         THE COURT:  On the record.

28         MR. HAMERSLOUGH:  Arlene, please listen to --

COPYING PROHIBITED PURSUANT TO GOV. CODE 69954(d)

28

1        THE COURT:  This is my understanding.  And one of

2    the things I care a lot about and I really encourage parties

3    to tell me -- because I really don't like surprises, and I

4    don't think anybody likes surprises.  So, the more you can

5    tell me and the more we can share, the better we are.

6        So, what I'm hearing from Mr. Wade is I don't

7    think -- I think I'm going to be in default right away.  I

8    don't have money.  I don't have money to pay this monthly

9    debt on the note.  So, what I think is going to happen is my

10   interest is going to accrue.  My late fee is going to

11   accrue.  And as a practical matter, when a license sells I

12   understand the note is accelerated; I don't have an option

13   anymore, and the money will come out of the sale.

14       What he's also telling me is it's a terrible

15   market to sell the licenses.  Another decision-making point

16   that I think Silver's going to have to decide is if you get

17   an offer, one side might say I think we should take it and

18   one side might say I think we should wait.  Silver gets to

19   make that call because that's, you know, who knows.

20       And also what Mr. Wade is telling me is the

21   construction -- you have to contract within a certain period

22   of time.  And when you come within a year, it gets tougher

23   to sell a license, and one or more of these are within a

24   year; is that --

25       MR. WADE:  Yeah, yes.

26       THE COURT:  How many are within a year?

27       MR. WADE:  That's all on the same date -- maybe

28   two months apart, but we're like 14 months from expiration.

29

1          THE COURT:  So, that there's a lot of pressure to

2  sell quickly is the point.

3          MS. STEVENS:  However, we're talking about --

4          MR. HAMERSLOUGH:  Go ahead.

5          THE COURT:  You can say it out loud.

6          MS. STEVENS:  Okay.  However, we're talking about

7  the three sell licenses.  There's also the Topeka.  It's the

8  TV, and the deadlines do not apply to that one.

9          THE COURT:  Is that accurate?

10          MR. WADE:  That's correct.

11          THE COURT:  Okay, so I just want to put everything

12  out on the table.

13          MR. HAMERSLOUGH:  So, here's what I want to do.

14  Then I want to have the ability to go in to see Judge Silver

15  and have him make decisions relative to -- if we need to to

16  extend these licenses, you know, we extend them.  If -- I'm

17  sorry?

18          MR. WADE:  They're no extensions.

19          MR. HAMERSLOUGH:  There will not be.

20          MR. WADE:  It's just like the FM; you do it or

21  die.

22          MR. HAMERSLOUGH:  Well, then if nothing else, he

23  has the ability to say then it's your asset or not.  I mean,

24  it's our security.

25          MS. STEVENS:  It's not actually do it or die

26  because you could always sell to another small business or

27  minority-owned.

28          THE COURT:  Let me just say something.  My

COPYING PROHIBITED PURSUANT TO GOV. CODE 69954(d)

30

1    understanding of this agreement is Silver has broad

2    authority to make decisions about how to do things to

3    maximize money.  If he thinks somebody has a good idea and

4    the other person opposes it, he has the right to say we're

5    doing it.  He has broad authority, and you have to live with

6    it.

7            MR. HAMERSLOUGH:  That's fine.

8            MR. TOWERY:  That's fine.

9            MR. HAMERSLOUGH:  We need somebody to make

10   decisions where we may have disputes about how to proceed

11   and go forward.

12           THE COURT:  Exactly.

13           MR. HAMERSLOUGH:  And he's got the power to make a

14   decision and allocate assets, you know, or how we're going

15   to move forward with those assets.

16           THE COURT:  Exactly.  It's not so much the

17   allocation.  I've done the allocation.  It's more the

18   decision making about how to proceed to maximize money, who

19   to sell to, how much, how to market, what price. ▓▓▓▓▓▓

20   ▓▓▓▓▓▓▓▓ the liquidation of assets is what we're talking

21   ▓▓▓▓▓▓

22           So, back to this one.  I think we now agree it's

23   seven percent, seven-year amortization but paid off over

24   three years with a balloon payment.  If I -- if a payment is

25   missed, it's a hundred dollar flat fee.  If payments are not

26   made, the interest will accrue.  The late fee will accrue.

27   And as soon as an asset is sold, the entire amount is due

28   and owing and will be paid out of the asset owed as an

31

1 obligation of this agreement.

2         MR. TOWERY:  Correct.

3         THE COURT:  Okay.

4         MR. HAMERSLOUGH:  The hundred dollars is --

5         THE COURT:  Per month per payment.

6         MR. HAMERSLOUGH:  Per month.

7         THE COURT:  Okay, next one.  We talked about -- we

8 talked about --

9         MR. HAMERSLOUGH:  I'm sorry, Judge.  Can you

10 repeat that?  Ms. Stevens --

11         THE COURT:  Okay.  One more time.  He owes you

12 $300,000.  He's going to give you a note for it.  It is not

13 going to have a seven percent interest amortized over seven

14 years but payable in three, which means it's a balloon

15 payment.  If he misses a payment -- and missing a payment

16 means he doesn't pay you anything or he pays you less than

17 what the schedule calls for, the obligation's accelerated,

18 meaning now he owes you the whole $300,000.  It's

19 accelerated to when some of those assets sell, whether it's

20 the sell licenses or the --

21         MR. TOWERY:  Topeka license.

22         THE COURT:  Topeka license.  As soon as one of

23 those Topeka licenses sells, he's obligated -- he can't keep

24 it in an account anymore.  He's got to give you up to

25 $300,000 plus the hundred thousand dollars -- strike that,

26 plus the hundred dollar late fee, plus the seven percent

27 that accrued to that point.

28         MS. STEVENS:  Isn't that amount securing something

COPYING PROHIBITED PURSUANT TO GOV. CODE 69954(d)

32

1   else as well?

2           THE COURT:  It is so that --

3           MS. STEVENS:  So, if that's depleted --

4           THE COURT:  So, when the next -- but now you have

5   it.  Now the money's yours.  When the next thing sells, he

6   keeps paying off the debt until he doesn't owe you the debt

7   anymore.  When the next one sells, it stays in the account

8   to secure the 3.5 million.

9           MR. HAMERSLOUGH:  Right.

10          THE COURT:  It's always better obviously for you

11  to have the money than sitting in an account.

12          MR. HAMERSLOUGH:  And it's principal and interest,

13  not just interest only, the monthly payment.

14          THE COURT:  That's correct.  It's fully amortized

15  except with a balloon payment.

16          Okay.  The next thing is that in terms of the sale

17  of those licenses and Topeka -- and I think I said this

18  already -- the split is 70/30, 70 percent to Stevens, 30

19  percent to Wade.  I need you here, Mr. Wade, so we're

20  waiting for you, okay?

21          MR. HAMERSLOUGH:  Your Honor, may we -- let's just

22  try to take an issue off the record, and then when Booker

23  gets back, we can deal with it on the record.

24          THE REPORTER:  Off the record?

25          THE COURT:  The only thing that scares me about

26  this is then we forget what we said.  Let's just wait for

27  him.

28          MR. HAMERSLOUGH:  All right.

33

1                    (Pause in proceedings.)

2               THE COURT:  Back on the record.

3               MR. WADE:  Excuse me, sorry.

4               THE COURT:  Not a problem.  All right, so we

5    finished up with equipment.  The next issue is?

6               MR. HAMERSLOUGH:  Well, Arlene wants to describe

7    some equipment relative to Wedding Television that she --

8               THE COURT:  Okay, go ahead.

9               MS. STEVENS:  Right.  There are certain pieces of

10   equipment that belongs to WTV, and that is including but not

11   limited to an editing -- editing equipment and a camera.

12              THE COURT:  Mr. Wade, do you know what she's

13   talking about?

14              MR. WADE:  Well, first, WTV is not an entity, so

15   I'm not sure what she says belongs to WTV, but the --

16              THE REPORTER:  Can't hear you.

17              THE COURT:  WTV is a corporation, is it not?

18              MR. WADE:  It is not.  It is a name of a program,

19   so I don't -- I think what she means is it was used for WTV,

20   but --

21              THE COURT:  TV-32 maybe.

22              MR. WADE:  No.

23              MS. STEVENS:  No, WTV.  It's a program.

24              MR. HAMERSLOUGH:  WTV --

25              MS. STEVENS:  Name of a program.

26              THE COURT:  Okay.  So, anyway, whatever it is, do

27   you know what she's talking about in terms of the camera and

28   equipment?

34

1          MR. WADE:  No.  I -- cameras were used in editing,

2   used in producing the programs, but they were owned by the

3   station.  I don't understand the claim of ownership by WTV.

4          MS. STEVENS:  Um, this is -- this is -- there's a

5   piece of editing equipment that I purchased directly from KM

6   -- from Channel 32's chief engineer.  His name is Russ

7   Brown.  I paid from -- I paid for it with my checkbook, and

8   I gave the check to him, and he delivered that editing

9   equipment to me.

10          THE COURT:  When was the last time you saw this

11   editing equipment?

12          MS. STEVENS:  It's been -- it may have been about

13   -- it was before the move, so that was, what, about two

14   years now?

15          THE COURT:  Okay, so --

16          MS. STEVENS:  And I would continually ask for it,

17   and I would never get it.

18          THE COURT:  Okay, so you haven't seen it for two

19   years, and --

20          MS. STEVENS:  Oh, I'm sorry, no.  I did see it

21   because it was eventually brought to 1010 when they were

22   putting together the WTV tapes for the launch, and it was at

23   1010.

24          THE COURT:  All right, so --

25          MS. STEVENS:  And the cameras --

26          MR. TOWERY:  Let me make a suggestion.  What I

27   would suggest is that we carve this out of the settlement

28   agreement so that we reserve jurisdiction for you to deal

COPYING PROHIBITED PURSUANT TO GOV. CODE 69954(d)

35

1  with it.

2          THE COURT:  Well --

3          MR. TOWERY:  To my knowledge, this issue has not
4  come up during discovery, so this is a new matter that we're
5  hearing about for the first time today.  There must be
6  receipts for all of this.

7          There's a suggestion that Russ Brown confirm what
8  she's saying now, let counsel go investigate it briefly and
9  figure out if we agree that there's a righteous claim and
10  should be included.  We'll include it if we have a
11  disagreement.  We'll, you know, by declaration come back and
12  tell you what the issues are.  But it's hard for us to agree
13  to something we're hearing about for the first time sitting
14  around this table deciding on --

15          MS. STEVENS:  Well, it's not because -- Booker
16  knows exactly what I'm talking about, and it's very
17  disconcerting that he's --

18          THE COURT:  Tell me about the camera.  You
19  explained about the editing equipment.

20          MS. STEVENS:  The camera is -- it's a new digital
21  camera that was purchased about two years ago for WTV.  And
22  KMTP has asked if they could use it as well, so they've been
23  using the camera.

24          THE COURT:  Okay, so my suggestion about this is
25  that we'll carve it out.  Having been carved out, we're
26  going to agree that to the extent that Ms. Stevens is able
27  to produce receipts for it, the attorneys will meet and
28  confer and see if they can reach an agreement.  If they

COPYING PROHIBITED PURSUANT TO GOV. CODE 69954(d)

36

1   cannot, it goes to Judge Silver for decision.

2               MR. TOWERY:  That's fine.

3               THE COURT:  Okay.

4               MR. HAMERSLOUGH:  Okay.

5               THE COURT:  The next thing is -- so, you
6   understood what I just said?

7               MS. STEVENS:  Yes.

8               MR. HAMERSLOUGH:  And why don't we just finish up
9   the rest of Wedding TV in terms of --

10              THE COURT:  Okay, and the last piece of Wedding TV
11  is that there's software and tapes, which basically means
12  the -- you produce some kind of show, and that's the tapes,
13  right?

14              MS. STEVENS:  Well, let me say software and
15  hardware because there's certain hardware that goes along
16  with the equipment that the tapes have to be played on, and
17  -- and that's used, so...

18              THE COURT:  The only thing you told me about were
19  the tapes.  I have my notes.

20              MS. STEVENS:  Right, yes, right.

21              THE COURT:  You said, "software and tapes."

22              MS. STEVENS:  Right.  And I failed to mention it
23  at that time, but there is the hardware that I just talked
24  about, and then --

25              THE COURT:  So, hardware will go along with the
26  editing equipment and the camera.  You need to come up with
27  the receipt.  You'll meet and confer.  And if you can't
28  reach agreement, you'll go to Silver on it.

COPYING PROHIBITED PURSUANT TO GOV. CODE 69954(d)

37

1          MS. STEVENS:  And --

2          THE COURT:  With respect to the soft -- the tapes,

3     the tapes are yours.  Do you have the tapes in your

4     possession?

5          MS. STEVENS:  No, I do not.  They were stolen from

6     my office.

7          THE COURT:  Do you have the tapes in your --

8          MR. WADE:  There are no tapes.  And maybe if we

9     can take a moment, the technology -- I think what she's

10    saying is the -- the wedding shows were produced by camera,

11    edited on computer, and then put onto hard drives.

12          I think she's talking about the hard drives, but

13    there are no tapes to begin with because it's a digital

14    process.  But if she's talking about the hard drives in

15    which the shows were -- the videotaping was captured on,

16    then I understand what she's talking about.  If it's

17    something else, then I'm lost.

18          THE COURT:  Okay, so the hard -- a hard drive is a

19    piece of equipment.

20          MS. STEVENS:  Exactly.

21          THE COURT:  What's put on the equipment is digital

22    information.

23          MR. WADE:  Right.

24          THE COURT:  Do you have the hard drive?

25          MR. WADE:  Yes.  We have the hard drive.

26          THE COURT:  Does the hard drive contain the

27    digital equipment, the digital information?

28          MR. WADE:  It does; they do, yes.

COPYING PROHIBITED PURSUANT TO GOV. CODE 69954(d)

38

1          THE COURT:  And are you willing to give the hard

2   drives over with the digital information?

3          MR. WADE:  Yes.

4          THE COURT:  Done.

5          MS. STEVENS:  There are tapes also because when

6   they're taking -- when the product was captured -- was

7   captured on tape, there are lots of very small tiny tapes

8   about this size (indicating.)

9          THE COURT:  What kind of camera captured tape?

10  Are we talking --

11         MS. STEVENS:  I don't know the name of or the

12  model of the tapes, but there were tapes and it's digital,

13  too.

14         THE COURT:  Why don't we say this --

15         MS. STEVENS:  There are DVDs as well.

16         THE COURT:  Why don't we say -- this is my

17  suggestion.  He'll give you the hard drives.  He'll give you

18  the digital information that's contained on it.  He will

19  give you everything he has related to the taping of this

20  wedding show.  If this is all he has, the hard drive and the

21  -- with the digital information, he will sign a declaration

22  under penalty of perjury saying he has no other form of --

23  there are no other tapes; there is no other physical media

24  containing this wedding filming.  And he'll sign under

25  declaration of penalty of perjury he doesn't have anything

26  else.  So, he -- either he gives it to you or he gives the

27  declaration.

28         MS. STEVENS:  Let me say this.  I failed to

COPYING PROHIBITED PURSUANT TO GOV. CODE 69954(d)

39

1 mention the hardware. There are certain ancillary pieces of

2 equipment that go along with it. I would like to be able to

3 determine what those pieces are because I don't want to just

4 say it was hardware. Because at first I just said it was

5 the editing system, but it includes a lot. You know, there

6 are things that are included in the whole system.

7        And then also if he just says under penalty of

8 perjury, then, you know, what would I have to do, take him

9 to court again? I mean, he knows there are tapes.

10        THE COURT: Well, he's telling me there aren't.

11 Is it Mr. Wade?

12        MR. WADE: Yes, ma'am. The tapes -- the DVD

13 drives are pulled out of the camera and then transferred to

14 digital --

15        THE COURT: Okay.

16        MR. WADE: -- media.

17        THE COURT: What things came out of the cameras?

18        MR. WADE: Those tapes, were three or four years

19 ago, dead, gone. I have no idea where they are, so I don't

20 have those. If we can find them, we'll --

21        MS. STEVENS: That's not true.

22        THE COURT: It's okay.

23        MS. STEVENS: He and Young Su (phonetic) stole

24 them out of my office.

25        THE COURT: It's okay. Ms. Stevens, you've got a

26 choice. I'm not just taking his word for it. I'm making

27 him do it under penalty of perjury. That's the deal. You

28 get what he has and a declaration under penalty of perjury

COPYING PROHIBITED PURSUANT TO GOV. CODE 69954(d)

40

1   or we don't have a deal.  I can't make him give you

2   something he's telling me he doesn't have.  So, do you want

3   to talk to your attorney?

4        MS. STEVENS:  Yes.

5        THE COURT:  Go.

6           (Pause in proceedings.)

7        THE COURT:  Okay.  Mr. Wade, you started to

8   explain something to me, and I want you to explain it out

9   loud in front of everybody.  So, explain everything about

10  these tapes.

11       MR. WADE:  I hear what she's asking for,

12  everything.  Again, as far as I know, we don't have tapes.

13  But on the other hand, I can't give her --

14       THE COURT:  No, what do you have?

15       MR. WADE:  I'm sorry, I can't release the station

16  copy because of regulatory requirements.

17       THE COURT:  Just lay it out for me.  The station

18  has copies of what?

19       MR. WADE:  As far as I know, the station has on

20  hard drives copies of the 200 or so videos that were

21  produced, Wedding Television videos.  We will give her those

22  hard drives, but we'll keep a copy of those, consistent with

23  regulatory requirements that we must maintain.

24       THE COURT:  Okay, so the hard drives that you said

25  that you would give her --

26       MR. WADE:  Yes.

27       THE COURT:  -- are the -- you just reconfirmed,

28  but then what you're also saying is I have to keep a copy of

COPYING PROHIBITED PURSUANT TO GOV. CODE 69954(d)

63

1      THE COURT:  That's correct.

2      MR. HAMERSLOUGH:  Right, and the other thing --

3      THE COURT:  Or decided by --

4      MR. FRY:  Or decided by Judge Silver.

5      MR. HAMERSLOUGH:  And the other thing we talked

6  about is Cooper-Fowler, Talley and Robertson have to sign

7  off that they have no further right, interest, control in

8  this; that they are subject to decisions by Judge Silver,

9  and that they agree to cooperate and sign what is necessary.

10  That obligation certainly exists between the parties on all

11  of these types of assets.

12      MR. TOWERY:  I don't see that being a problem.

13      MR. HAMERSLOUGH:  All right.

14      THE COURT:  Okay, so --

15      MS. STEVENS:  So, any costs I have will be borne

16  by him also proportionately if --

17      THE COURT:  So --

18      MS. STEVENS:  If I --

19      THE COURT:  The reason why we're doing Topeka this

20  way is because you own Topeka 70/30.  So, if there's -- with

21  respect to Woodside, Woodside you own a hundred percent.

22  Your costs are a hundred percent.  1010 Corporation Way he's

23  going to own a hundred percent.  He's responsible a hundred

24  percent.  The costs going forward who pays is determined by

25  the ownership interest.

26      MS. STEVENS:  So, then who determines what costs

27  should be incurred?

28      THE COURT:  If there's a dispute, Silver.

COPYING PROHIBITED PURSUANT TO GOV. CODE 69954(d)

64

1          MR. HAMERSLOUGH:  Silver.

2          MS. STEVENS:  So, then before any costs are

3    incurred, then I should know about it and approve it?

4          THE COURT:  If they're going to be in your lap,

5    yes.

6          MR. HAMERSLOUGH:  Yes.

7          THE COURT:  Okay.  That takes care of that one.

8          MS. STEVENS:  And by the same token, if I incur

9    any costs associated with Topeka, then they would have to

10   pay proportionately?

11         THE COURT:  That's correct.

12         MR. HAMERSLOUGH:  We have to get their authority.

13         THE COURT:  Everything works --

14         MR. HAMERSLOUGH:  Judge, North Hampton, the

15   Arizona property is ours.

16         THE COURT:  Belongs to Ms. Stevens.

17         MR. HAMERSLOUGH:  We have two cars.  We've agreed

18   each party is going to take a car.  We have to sign one over

19   to Mr. Wade.  We need to make sure that any automobile

20   insurance, you know, gets signed over.  I'm -- any credit

21   cards or any, you know, costs that have been incurred by an

22   individual are their responsibility.

23         MR. TOWERY:  Okay.

24         MR. HAMERSLOUGH:  Yeah.

25         MS. STEVENS:  Any costs that are now owing.

26         MR. HAMERSLOUGH:  Yes.

27         THE COURT:  Is their responsibility, person's

28   responsibility.  If there's any disputes about those, you'll

65

1  go to Judge Silver.  Start date, I would like the start date

2  to be tomorrow.

3          MR. WADE:  No.  I --

4          THE COURT:  That's when -- this is binding as of

5  today.

6          MR. WADE:  I can't do it, Judge.  I can't make

7  a --

8          THE COURT:  I need -- you know what, folks, you

9  talk about it.  I have to make a phone call.  Just talk

10  among yourselves about a start date.

11          MR. HAMERSLOUGH:  We'll pay for Palo Alto, the

12  condo.  Jim's idea was that the effective date, you know,

13  should be with possession.  He's got possession of 1010.

14  He's got possession of Woodside.  He wants to get out in ten

15  days, out of Woodside.  He pays up and brings it current

16  through that date.

17          MR. TOWERY:  I mean, first of all, the problem

18  with the effective date is Booker's not going to be kicked

19  out on the street tomorrow.  I mean, that's just totally

20  unreasonable.

21          THE COURT:  No, effective date in terms of paying

22  for the cost.  So --

23          MR. WADE:  Cost of what?

24          THE COURT:  So, maybe -- in other words, as of --

25  did you pay Woodside's mortgage?

26          MR. WADE:  She pays it.

27          THE COURT:  That's right.  I forgot about --

28          MS. STEVENS:  Oh, he admitted that.

COPYING PROHIBITED PURSUANT TO GOV. CODE 69954(d)

66

1          THE COURT: I forgot about that.

2          MR. WADE: And it's unpaid --

3          THE COURT: Stop, stop. Let me try to finish this

4    up. Woodside is paid for. In terms of cost as of January

5    22nd, 1010 Corporation Way, there's an allocation of who's

6    responsible beginning tomorrow, from tomorrow forward the

7    mortgage and the utilities. And what builds up is going to

8    be your responsibility backwards. There's not going to be

9    an accounting, though I need to tell you she didn't pay

10   January. It's due on the 16th, and she didn't pay. So,

11   essentially -- in effect, I mean, it's a few days off, but

12   you're responsible for Corporation Way. In terms of living,

13   we'll figure out a grace period, so --

14         MR. WADE: The first thing is making an effective

15   date in the middle of the mortgage period or accrual period

16   makes no sense at all.

17         THE COURT: Well --

18         MR. WADE: Judge, please. It just makes no

19   business sense. And the fact she's saying it's unpaid means

20   the effective date is really retroactive to the 1st in terms

21   of my responsibility.

22         MR. HAMERSLOUGH: Who's had possession of it?

23         THE COURT: Stop, stop.

24         MR. WADE: Would you be quiet for a moment.

25         THE COURT: Go ahead, Mr. Wade.

26         MR. WADE: So, this becomes a de facto effective

27   date. And since there's no accountings at the moment and

28   since she has some money and I have none, that's me behind

COPYING PROHIBITED PURSUANT TO GOV. CODE 69954(d)

67

1   the 8 ball.  This whole thing is just going to fall apart

2   with this effective date.  I cannot deal with this, will

3   not, cannot.

4           THE COURT:  We need to take a break.  I can't

5   resolve it.  I needed to be across the street two minutes

6   ago.  So, I want everybody to come back.  This is the last

7   issue I think, and we'll figure out the effective date.

8           MR. TOWERY:  When?

9           THE COURT:  At 9:15, 9:15.

10          MR. TOWERY:  Very good.

11          THE COURT:  Okay, 9:15.  see you back tomorrow.

12          MR. TOWERY:  Thanks, Your Honor.

13          MS. STEVENS:  Thank you.

14          THE COURT:  Be thinking about it, and think of a

15  date.

16              (Whereupon, the proceedings were concluded.)

17

18

19

20

21

22

23

24

25

26

27

28

68

1       IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

2         IN AND FOR THE COUNTY OF SANTA CLARA

3       BEFORE THE HONORABLE JAMIE JACOBS-MAY, JUDGE

4             DEPARTMENT NO. 4

5                ---oOo---

6  ARLENE STEVENS, SUNGILT    )
   CORPORATION and TV-32 DIGITAL  )
7  VENTURES, INC.,            )
                        )
8      Plaintiffs,      )
                        )
9      vs.               )  Case No. 1-07-CV-090284
                        )
10 COOPER-FOWLER MEDIA COMPANY,   )  SETTLEMENT
   MINORITY TELEVISION PROJECT,   )
11 INC., GREG TALLEY, SHEILA     )
   ROBERTSON TALLEY and BOOKER T. )
12 WADE, JR.,             )
                        )
13      Defendants.      )
   ————————————————————————————————)
14                       )
   AND RELATED CROSS-ACTION.     )
15  ————————————————————————————————)

16

17                ---oOo---

18      REPORTER'S TRANSCRIPT OF PROCEEDINGS

19       Thursday, January 22, 2009

20      VOLUME II of II - Pages 68 - 117

21                ---oOo---

22 A-P-P-E-A-R-A-N-C-E-S:

23 FOR THE PLAINTIFFS:         DAVID M. HAMERSLOUGH and
24                        STEPHEN S. FRY,
                           Attorneys at Law
25
   FOR THE DEFENDANTS:         JAMES E. TOWERY and
26                        NATASHA M. PARRETT,
                           Attorneys at Law
27

28 OFFICIAL COURT REPORTER:     PATRICK CROWLEY, CSR 11271
                           RPR, CRR 846186

COPYING PROHIBITED PURSUANT TO GOV. CODE 69954(d)

69

1  San Jose, California                    Morning Session

2                    PROCEEDINGS

3       THE COURT:  The record will reflect of that all

4  parties and attorneys are present.  When we left off

5  yesterday we were focused on the start date.  I just want to

6  talk about it for a second and talk about the equipment, and

7  I don't think we said this.  This is a little bit of

8  clean-up in case we didn't say it.

9            There's a 300,000 -- a $300,000 value attached to

10  the equipment, and we talked about how there's this pot of

11  money from the sale of the licenses of Topeka to secure the

12  payment of the $300,000.  We went into that in a great deal

13  of detail.

14            If for some reason there's not enough money in

15  that pot to cover it, the equipment is also security for the

16  $300,000 debt.  So -- and that's a fairly standard practice.

17  In other words, if you don't pay the money and the money --

18  and there's not enough money to pay it, then the equipment

19  serves as security for the debt as well.  So, that's --

20       MR. TOWERY:  One thing that did not surface in our

21  discussions about the equipment yesterday is that the

22  equipment presently acts as part of the security for the

23  Sonoma Bank loan.  In other words, the bank has a secured

24  interest in the equipment.

25       THE COURT:  Okay.  The Sonoma Bank loan is the

26  one --

27       MR. TOWERY:  On 1010.

28       THE COURT:  On 1010.

COPYING PROHIBITED PURSUANT TO GOV. CODE 69954(d)

70

1    MR. TOWERY:  That's correct.

2    THE COURT:  All right.

3    MR. TOWERY:  So --

4    THE COURT:  I'm glad that you said that, so that's
5  in there, too.

6    MR. TOWERY:  So, the security interest of
7  Ms. Stevens in the equipment, the ultimate equipment would
8  be junior to any existing security interest in it.

9    THE COURT:  Understood.

10    MR. TOWERY:  Okay.

11    THE COURT:  And thank you for pointing that out.

12    MR. TOWERY:  And this raises the issue -- I
13  appreciate the fact that we have not dealt with how title to
14  1010 is going to be transferred because as we discussed
15  yesterday, we're willing to look at the tax consequences and
16  do it in the most friendly tax manner.  But title to the
17  equipment is presently in TV-32, and it's security for the
18  loan.  So, however title to 1010 gets changed after we go
19  through the process of determining the tax consequences,
20  title to the equipment needs to follow title to the building
21  because it is security for the loan, for the Sonoma loan on
22  the building.

23    THE COURT:  All right, and now I'm going to give
24  you folks a chance to just take a one-minute discussion to
25  -- right now we have the ownership of the equipment, as I
26  understand it, being given to Mr. Wade.  And with the
27  understanding that to the extent that KMTP has an interest
28  in it, the settlement agreement will have to include them

COPYING PROHIBITED PURSUANT TO GOV. CODE 69954(d)

71

1  giving up an interest to it; and that Mr. Wade will

2  indemnify and hold harmless Ms. Stevens for any claims of

3  KMTP to the equipment or for that matter anything else.  So,

4  we'll just -- which is the reason why you need to have KMTP

5  signing off in language that you feel protects yourself.

6        MR. TOWERY:  We agree that --`first of all, that

7  Mr. Wade is going to become the owner of the equipment.  We

8  agree with the principle of indemnification.  I had assumed

9  -- and maybe this is a good time to clarify that.  It's not

10 going to be indemnification limited to this issue, but it is

11 going to be a broad mutual indemnification clause in the

12 agreement; that if the conduct of either party causes a

13 financial loss to the other, there are rights of

14 indemnification.

15        THE COURT:  And specifically because there are

16 outstanding parties that Mr. Wade has control -- strike

17 that.  I don't want to say control over -- that's a loaded

18 word -- but is affiliated with KMTP, his niece and his

19 nephew.  You're going to be drafting language that you think

20 protects yourself, but Ms. Stevens is going to get indemnity

21 from Mr. Wade for those kinds of things, meaning the people

22 and entities affiliated with them.

23        MR. TOWERY:  What I had assumed was going to be

24 included is an indemnification clause that says among other

25 things if there are claims of a third party that cause a --

26        THE REPORTER:  Cause a what?

27        MR. TOWERY:  A loss to any party, then the other

28 party indemnifies that person.

COPYING PROHIBITED PURSUANT TO GOV. CODE 69954(d)

72

1        THE COURT:  And it's not just of loss but if they

2   have to defend against.  So, it's a right of indemnification

3   for any defense and any loss.

4        MR. TOWERY:  That's correct.

5        MR. HAMERSLOUGH:  I'd just like to see the scope

6   of the language that he's talking about.  I mean, I

7   understand the concept, but it's...

8        THE COURT:  All right.  Is that agreeable,

9   Ms. Stevens?

10       MS. STEVENS:  Did you say we had a minute to talk

11   about it?

12       THE COURT:  Yes.  I mean literally a minute.

13       (Whereupon, a discussion was had off the

14       record.)

15       THE COURT:  We are going to skip over the issue of

16   ownership of the equipment and get back to it in a minute.

17       I want to go to the start date.  I shared my

18   thoughts I think with both of you, which is -- and I think I

19   did it yesterday on the record, which is, well, let's pick a

20   start date.  My thinking is -- yesterday my thinking was

21   today.  Today my thinking is tomorrow.

22       And before we do that, I want to confirm because I

23   don't want there to be any surprises.  In terms of payments,

24   I want to know what has been paid and what has not been

25   paid.  So, let's just take Palo Alto first.  Is there any

26   delinquencies on Palo Alto?

27       MR. WADE:  Current on the mortgage and

28   approximately $3,000 in homeowner's fees.

COPYING PROHIBITED PURSUANT TO GOV. CODE 69954(d)

73

1        THE COURT:  Have not been paid?

2        MR. WADE:  Have not been paid.

3        THE COURT:  Okay, so the current mortgage has not

4   been paid.  How much is it?

5        MR. WADE:  4100.

6        THE COURT:  And homeowner's fees have been

7   accruing, and you owe 3,000 bucks?

8        MR. WADE:  Approximately, yes.

9        THE COURT:  Okay.  In terms of 1010 --

10        MR. HAMERSLOUGH:  How about property tax?

11        THE COURT:  What about property tax?

12        MR. WADE:  They're unpaid as well.

13        THE COURT:  For when?  For how long and what

14   amount?

15        MR. WADE:  4500 approximately.

16        THE COURT:  What else?  What about insurance?

17        MR. WADE:  The insurance is included by the

18   homeowner's association and includes for physical damages.

19        THE COURT:  Any other questions on Palo Alto?

20        MR. HAMERSLOUGH:  Steve, you have any questions on

21   Palo Alto?

22        MR. FRY:  No.

23        THE COURT:  Okay.  Let's move to 1010.  What are

24   the delinquencies on 1010?

25        MR. FRY:  It's my understanding that the Sonoma

26   National Bank loan, which was due on the 16th, has not been

27   paid.

28        THE COURT:  It's due on the 16th or it's due on

COPYING PROHIBITED PURSUANT TO GOV. CODE 69954(d)

74

1 the 1st; it has to be paid by the 16th?

2          MS. STEVENS:  Yes.

3          MR. FRY:  Due on the 1st, late on the 16th.

4          THE COURT:  So -- and what's the amount of that?

5          MS. STEVENS:  It's about 12.

6          MR. FRY:  It's about $12,400.

7          THE COURT:  Okay.  Have taxes been paid, property

8 taxes?

9          MR. FRY:  Taxes are current.

10          THE COURT:  And insurance --

11          MR. FRY:  There's a second also through Colson

12 Financial Services, and that has been an automatic debit out

13 of the account, and that has been made.

14          THE COURT:  Okay.  Anything else that has not been

15 paid that you know of?

16          MR. FRY:  The only thing that's due is the

17 insurance, current insurance payment is due.  That's about

18 $2200.

19          MR. TOWERY:  When were utilities last paid?

20          THE COURT:  Utilities, when were they last paid?

21          MR. FRY:  I sent you the bills for the last

22 payment for utilities about three weeks ago.

23          MR. TOWERY:  The question is when were the

24 utilities last paid.

25          MR. FRY:  Prior to -- whatever date prior to

26 the --

27          MR. TOWERY:  Were they paid in December, not paid

28 in January?

COPYING PROHIBITED PURSUANT TO GOV. CODE 69954(d)

75

1        MR. FRY:  I can't -- I don't have a copy of the

2  bill that I sent you, but that's probably about right.

3        THE COURT:  Okay.  Woodside?

4        MR. FRY:  Woodside mortgage again I believe is due

5  on the 1st, late on the 16th, has not been paid.

6        THE COURT:  In the amount of?

7        MR. FRY:  It's about $9,968.

8        THE COURT:  So, we'll call it 10,000.  All right,

9  so that's the background.  My suggestion is just like we've

10  done with all other accountings back and forth.  Money is

11  not going to switch hands, and people are going to take the

12  property subject to these debts owing.  And they are not

13  going to be the responsibility of the other side.

14        So, on Palo Alto, for example, you own it 60/40.

15  So, that money's going to get paid out of the proceeds.

16  Then obviously you share in that 60/40.

17        To the extent that Ms. Stevens is taking Woodside,

18  she's taking -- she'll be responsible for the deficiencies.

19  To the extent that Mr. Wade is taking 1010, he'll be

20  responsible for the deficiencies.  You're taking it subject

21  to these deficiencies.

22        My suggestion is that we start this obligation

23  tomorrow because you're taking subject to the deficiencies,

24  and the start date doesn't matter because you're taking it

25  subject to the deficiencies anyway.

26        In terms of moving out, which is more critical, my

27  suggestion is that we talk about practically what the best

28  time to move out is.  How much time do you need?  How much

COPYING PROHIBITED PURSUANT TO GOV. CODE 69954(d)

76

1  time do you want?  When do you want to start?  So,

2  Ms. Stevens is going to be moving out of Palo Alto, moving

3  into Woodside.  When did you want to do that?  Here's my

4  suggestion.

5          MR. HAMERSLOUGH:  Answer her question.  Tell her.

6          THE COURT:  Ms. Stevens, my suggestion is 30 days.

7  My suggestion is that -- and just to make it a time that

8  gives you -- why don't we say the 23rd of February because

9  that gives you some weekends in there and some holidays in

10  there.

11          MR. TOWERY:  Which day of the week is the 23rd?

12          THE COURT:  It's a Monday.

13          MR. TOWERY:  Okay, thank you.

14          THE COURT:  The last Monday of the month, having

15  taken advantage of some holidays.  So, that would mean that

16  you need to vacate -- I mean, it's up to you, but you would

17  need to vacate all your stuff out of Palo Alto.  Mr. Wade

18  would have to move all his stuff out of Woodside, and then

19  you would move into Woodside.

20          Now, you had a -- you had asked me a question.  I

21  shared it with the other side.  Why don't you say it out

22  loud.

23          MR. TOWERY:  Mr. Wade is obviously going to need a

24  place to live.  I presume the Palo Alto condo is going to be

25  listed for sale as rapidly as can be arranged following the

26  execution of this settlement agreement.  Assuming that that

27  is sitting vacant pending sale, it makes good sense to me to

28  allow Mr. Wade to live there until the sale occurs.

COPYING PROHIBITED PURSUANT TO GOV. CODE 69954(d)

77

1          THE COURT:  Any objection?

2          MR. HAMERSLOUGH:  Just tell us what your response

3  is.

4          MS. STEVENS:  No objection to that.

5          THE COURT:  Okay.

6          MS. STEVENS:  And then on Woodside, would I be

7  able to live there until the sale?

8          THE COURT:  It's yours.  You can live there as

9  long as you want or as short as you want.  It's yours.

10          MS. STEVENS:  Okay.

11          THE COURT:  All right, so there's no objection.

12  That's what we will do.

13          MR. HAMERSLOUGH:  My only -- my only comment is

14  we're going to have to agree on a broker, you know, to list

15  that property.  And I just want the cooperation with that

16  broker in terms of --

17          THE COURT:  As part of this agreement --

18          MR. HAMERSLOUGH:  Showing and, you know.

19          MR. TOWERY:  Of course.

20          MR. HAMERSLOUGH:  I'm not suggesting staging, but

21  you know what I'm saying.

22          MR. TOWERY:  Of course.

23          THE COURT:  And as part of this agreement there

24  has to be good faith cooperation.  And if there are any

25  issues about that, you'll go to Judge Silver.

26          But implicit in that -- and my sense is that

27  actually a property shows better when someone is living

28  there, but that you have to keep it clean; you have to

COPYING PROHIBITED PURSUANT TO GOV. CODE 69954(d)

78

1   cooperate; you have to take the locks off, whatever it takes

2   to sell.

3           Okay.  Then the last piece of this --

4           MR. HAMERSLOUGH:  I'm sorry, may I ask one

5   clarification?

6           THE COURT:  Yeah.

7           MR. HAMERSLOUGH:  You described who will be

8   responsible for what has not been paid --

9           THE COURT:  Right.

10          MR. HAMERSLOUGH:  -- starting tomorrow.  Though

11  going forward the obligations are going to be incurred --

12          THE COURT:  They go with the person.

13          MR. HAMERSLOUGH:  They go with the person.

14          THE COURT:  So, in other words, 1010 goes with --

15  that's why it doesn't matter when we start it.  1010 goes

16  with Mr. Wade.  Woodside goes with Ms. Stevens, and Palo

17  Alto is shared 60/40; 60 Stevens, 40 Wade.

18          MR. HAMERSLOUGH:  Right.

19          THE COURT:  Because that's how you own it.  Okay.

20  Moving right along, the last -- the very last piece of this

21  is the ownership of KMTP.

22          MR. HAMERSLOUGH:  Ownership of --

23          THE COURT:  The ownership of the equipment.  Let

24  me just say a couple more things just to make sure I covered

25  them.  Ms. Stevens has a house in Arizona.  That is

26  obviously hers.  The -- I think we've already said

27  Ms. Stevens has a brother.  His deposition was taken.  He's

28  made noises about suing.  I'm just saying this out loud

COPYING PROHIBITED PURSUANT TO GOV. CODE 69954(d)

79

1 because I don't want anything to be unsaid.

2      MR. TOWERY: Let me just add to that. With

3 respect to any potential claim of John Stevens, there is

4 nothing in this settlement agreement that addresses that in

5 any way, shape or form. Nobody's assuming responsibility

6 for that.

7      MR. HAMERSLOUGH: Nor is anybody giving up any --

8      MR. TOWERY: Correct.

9      MR. HAMERSLOUGH: -- cross-complaints that --

10 should something be filed.

11      MR. TOWERY: Correct.

12      THE COURT: Okay. Then we talked about cars. I

13 think you covered that already; that you'll arrange for the

14 transfer of title of Mr. Wade's car to Mr. Wade. He's

15 responsible for his own insurance.

16      Credit cards. You each are responsible for the

17 debts you incurred on any credit cards. To the extent you

18 have some joint credit card, my suggestion is that you

19 destroy it; that any joint credit cards be destroyed. If

20 either of you have a credit card in the other person's name,

21 it shall be destroyed, and you're responsible for any

22 charges that you made onto those credit cards if there are

23 any.

24      MR. FRY: And, Your Honor, just to add one point

25 on that. As you know, we've discussed the other issues with

26 respect to indemnification or hold harmless in the event

27 that there's any liability.

28      THE COURT: Listen to this, Mr. Towery. Listen to

80

1  this.

2  MR. FRY:  With respect to the vehicle and the fact

3  that Ms. Stevens, you know, has held title to that vehicle,

4  to the extent that there's any liability or claims that are

5  brought against Ms. Stevens, you know, while Mr. Wade has

6  had the use of the vehicle, then the indemnification, hold

7  harmless would apply to that as well.

8  THE COURT:  That would be correct.

9  MR. TOWERY:  That's fine.  We do not need separate

10  indemnifications clauses for each little issue.  These are

11  all covered under the umbrella indemnification clause.  I

12  agree with the principle that you're saying.

13  THE COURT:  Okay, and then the last thing that I

14  wanted to say is to the extent that you folks are fighting

15  about personal property or anything -- so, it's a broad

16  thing.  If you're fighting about anything other than what

17  does that agreement mean, which I'll handle, but the -- for

18  example, my grandmother's broach is missing in terms of

19  personal property or anything like that, those kinds of

20  issues all go to Judge Silver.

21  If for some reason Judge Silver is either

22  unwilling or unable to hear the case, this agreement says

23  you shall pick a new neutral person.  If you can't agree on

24  a new neutral person, you'll come to me, each of you, giving

25  me two names and a CV, and I'll pick the neutral person for

26  you.  But you're going to have a neutral -- a neutral,

27  private neutral who will through a mediation, slash,

28  arbitration process quickly resolve all of these issues for

COPYING PROHIBITED PURSUANT TO GOV. CODE 69954(d)

81

1  you.

2          Finally, the equipment ownership of KM -- strike

3  that, the equipment ownership.

4          MS. STEVENS:  May I have a moment, please?

5          THE COURT:  Literally a moment.

6               (Pause in proceedings.)

7          MR. HAMERSLOUGH:  The question that she's raised

8  has to do with the Private Bank of the Peninsula account

9  where money has been deposited.

10          THE COURT:  You mean -- what about it?  Who has

11  that account?

12          MS. STEVENS:  TV-32 Digital Ventures.

13          THE COURT:  Do you know what Ms. Stevens is

14  talking about?

15          MR. WADE:  There are two TV-32 Digital Ventures

16  accounts.  She has one; I have one.

17          THE COURT:  And so there are two accounts, and in

18  whose names -- are they with the same bank?

19          MR. WADE:  No.  They're different banks, and --

20          THE COURT:  One is with?

21          MS. STEVENS:  Comerica.

22          THE COURT:  Is that yours, Ms. Stevens?

23          MS. STEVENS:  Yes.

24          THE COURT:  Are you the signatory?

25          MS. STEVENS:  Yes.

26          THE COURT:  And one is with?

27          MR. WADE:  Private Bank of the Peninsula, and I'm

28  the sole signature on that.

COPYING PROHIBITED PURSUANT TO GOV. CODE 69954(d)

82

1        THE COURT: And the answer is whoever's name is on

2    the account has that account and has what's in the account,

3    and that's the way this would go under the agreement.

4        My understanding is on Private Bank, per Mr. Fry,

5    it's been money in, money out. In other words, there's no

6    money sitting in that account. Is that correct, Mr. Fry?

7        MR. FRY: I don't know currently. I haven't seen

8    the records through about October of 2008.

9        THE COURT: Can you tell us today how much money

10   is in that account?

11       MR. WADE: Which account, mine?

12       THE COURT: Private, yes.

13       MR. WADE: Four or 5,000.

14       THE COURT: Four or 5,000. And that's consistent

15   with your history?

16       MR. FRY: Yes.

17       THE COURT: Okay, so --

18       MR. HAMERSLOUGH: Why don't we just get a

19   statement under penalty of perjury that is accurate?

20       MR. WADE: What difference does it make? I

21   mean --

22       THE COURT: It's okay.

23       MR. WADE: Am I entitled to see what's in her

24   accounts and...

25       THE COURT: You're making representations. What

26   we want are those representations to reach this.

27       MR. WADE: What are their representations?

28       THE COURT: Their representation as to Comerica.

COPYING PROHIBITED PURSUANT TO GOV. CODE 69954(d)

83

```
1          MR. WADE:  Yes.

2          THE COURT:  What's your representation as to

3     Comerica?

4          MS. STEVENS:  Excuse me?

5          THE COURT:  How much money is in the Comerica

6     account?

7          MS. STEVENS:  I think there may be about 3,000.

8          THE COURT:  So, we'll make it mutual.  Each of you

9     will give the last -- in fact, instead of a declaration

10    under penalty of perjury, give the December and January

11    account, your bank accounts, the thing you get from the

12    bank, your December and January.  You'll give them your

13    Comerica one.  They'll give you the Private.

14         MS. STEVENS:  The statements?

15         THE COURT:  The statements.

16         MS. STEVENS:  And then what happens?

17         THE COURT:  That's it.  You each will confirm

18    there's very little money in those accounts, and there's

19    certainly not enough money to fight about.

20         MR. FRY:  Well, one thing that might be useful

21    also, if the parties simply agree to close those accounts.

22    I mean, there's no reason for them to continue.

23         THE COURT:  That's not the point that Ms. Stevens

24    is concerned about.

25         MR. HAMERSLOUGH:  I think I agree with the judge.

26         MS. STEVENS:  But my point is that there's

27    actually -- I'm sorry, actually Comerica -- TV-32 Digital

28    Ventures actually does not have any money because the money
```

COPYING PROHIBITED PURSUANT TO GOV. CODE 69954(d)

84

1   that is in there is loaned to it from me, so that is my

2   money.  The money that's in the Private Bank of the

3   Peninsula is legitimate income owed to TV-32 Digital

4   Ventures.

5           THE COURT:  Ms. Stevens, we've gone through all of

6   this.  We've talked about it.  We've talked about how money

7   is not going to be exchanged back and forth.  We've talked

8   about that as an underlying premise.  So, you're bringing up

9   old information.

10          And if what you need is confirmation because we're

11  relying on information given to us and the information is

12  from Mr. Fry confirmed by Mr. Wade, there is very little

13  money that sits in the account.  Four or $5,000 comes in and

14  four or $5,000 goes out.

15          To confirm that information, I'm requiring as part

16  of this settlement each of you exchange information so you

17  can have confirmation.  We have talked about it.  We have

18  decided these issues.  It's a yes or no.  You don't like it,

19  go upstairs.  And we've been at this for two and a half

20  days.  This is old news.  So, the issue that -- we've

21  decided that issue.  You don't like it, go upstairs and have

22  your trial.

23          The last issue that we haven't decided under this

24  is the ownership of the equipment.  That's what I was

25  waiting for an answer about.  I've been waiting all morning,

26  an issue you brought up today.  So, let us hear what the

27  answer is.

28          MR. HAMERSLOUGH:  What's the answer?  Which way do

COPYING PROHIBITED PURSUANT TO GOV. CODE 69954(d)

85

1  you want to go?

2         MS. STEVENS:  For what?  For the money per the

3  bank account for the equipment?

4         MR. HAMERSLOUGH:  The equipment.

5         THE COURT:  So, on the bank account you're going

6  to get confirmation that there's very little money, four or

7  $5,000.  If you don't -- let me just ask you now.  If you're

8  sort of saying, well, I want that money and I want the

9  history of that money and I want the money from Mr. Wade,

10  then we should stop talking because we've been there.  We've

11  talked about that stuff, and it's not going to happen.  So,

12  if that's your issue, go upstairs.

13         And I said the same thing to Mr. Wade.  He started

14  out asking for $150,000 from you, and I said no, no money,

15  not going to happen.

16         MR. HAMERSLOUGH:  He asked yesterday for money on

17  Cooper-Fowler.  The answer was --

18         THE COURT:  No.

19         MR. HAMERSLOUGH:  -- no.

20         THE COURT:  Not going to happen.  So, if either of

21  you feel I'm not going to settle unless I get money from the

22  other side, both of you go upstairs.  It's not going to

23  happen under this agreement.  Each of you think the other

24  person has money.  Each of you think you're entitled to

25  money.  So, the way -- it will not settle with either of you

26  paying the other person money.  He will not settle -- strike

27  that.  I think he will settle finally with you not giving

28  any money.  And if you're saying I'm not going to, go

COPYING PROHIBITED PURSUANT TO GOV. CODE 69954(d)

86

1   upstairs and stop wasting our time.

2           MS. STEVENS:  However, TV-32 Digital Ventures is
3   not him.

4           THE COURT:  It's okay.  Is your point that unless
5   I get money coming from him from some account, even if it's
6   TV-32, I'm not going to settle?  Is that your point after
7   two and a half days of talking settlement where this is --
8   where we made clear that's not going to happen?

9           MS. STEVENS:  I'd like to know -- not only have a
10  statement of what's in the account but a history of where
11  the money went.

12          THE COURT:  You're -- not going to happen as part
13  of a settlement.  So, you've had a year's worth of
14  discovery, and that's what you get in discovery.  If you
15  want a confirmation of what's in the account last month or
16  this month, I'll give it to you to move this thing along,
17  but this is way beyond discovery now.

18          MR. TOWERY:  Your Honor, may I say just for the
19  record for clarification, yesterday there was a response to
20  a subpoena that was served by counsel on Private Bank.  I
21  saw 40 pages worth of bank statements and cancelled checks
22  for the TV-32 Digital account at Private Bank.  Counsel has
23  that response to the subpoena as well.  The history has been
24  provided.

25          MR. HAMERSLOUGH:  Well, I don't know --

26          MR. FRY:  I haven't had an opportunity to review
27  the records.

28          THE COURT:  But you have them.  So, what are we

COPYING PROHIBITED PURSUANT TO GOV. CODE 69954(d)

87

1  doing, folks?  So, it has been way too much time.  I mean,

2  just let me know what you want to do.  If you want to go to

3  a trial, go upstairs and go to a trial.  It's been two and a

4  half days of this, and we're down to the last question.

5        Who do you want the ownership of the equipment to

6  be in?  You're backtracking.  If you don't want to settle,

7  just tell me.  Stop wasting my time.  It's okay to go to

8  trial.  Go.  And if you want to settle, then let's do it.

9        MS. STEVENS:  Well, let's talk about the other

10 outstanding issues.

11        THE COURT:  There's one more.  Just tell me.

12        MS. STEVENS:  There's also WTV.

13        THE COURT:  There is no outstanding WTV.

14        MR. HAMERSLOUGH:  We've already put it on the

15 record, Arlene.

16        MS. STEVENS:  We did not determine if I'm getting

17 the equipment or not.

18        MR. FRY:  We've reserved with Judge Silver that

19 issue.

20        THE COURT:  So, let me get the answer to this last

21 question, and then let me see if you want to agree to the

22 settlement.  The answer to the last question is the

23 equipment -- the name of the -- who should own the

24 equipment.  Do you want it to be Mr. Wade with the

25 concomitant obligation to secure the payment or do you want

26 it to be KMTP?

27        MS. STEVENS:  Can we talk?

28        MR. HAMERSLOUGH:  No.  You need to answer the

COPYING PROHIBITED PURSUANT TO GOV. CODE 69954(d)

88

1   question.

2           THE COURT:  We've talked for three hours now.

3   Just give me the answer.

4           MS. STEVENS:  Those are the only two options?

5           THE COURT:  That's correct.

6           MS. STEVENS:  Well, I have a third option.

7           THE COURT:  And your third option is?

8           MS. STEVENS:  Is that it be owned by KMTP but

9   secured by something.

10          THE COURT:  So --

11          MS. STEVENS:  No, I'm sorry; that it continue to

12  be owned by Digital Ventures until all of the payments,

13  installment payments are completed.

14          MR. TOWERY:  No.

15          THE COURT:  Okay.  So, now your two choices are

16  KMTP or Mr. Wade.

17          MS. STEVENS:  I still stand by my third choice.

18          THE COURT:  Okay.  Then you don't have an

19  agreement over the title in the equipment.  If it was owned

20  by W -- by TV-32 or WTV or whatever it's called, how does

21  that help anything?

22          MS. STEVENS:  Well, if the payments are not paid,

23  then at least I -- and it would -- it would be in my name,

24  not Digital Ventures.  Then at least I would have the

25  equipment, that I would be able to sell it to get the money

26  to satisfy the loan.

27          THE COURT:  Can you think of any faster way to get

28  this issue off the table so that that's not -- so that this

COPYING PROHIBITED PURSUANT TO GOV. CODE 69954(d)

89

1    $300,000 goes away; it becomes a nonissue?

2             MR. TOWERY:  I wish I had an answer.  I'm sorry, I

3    don't.

4             THE COURT:  If -- here's my thinking.  We're

5    selling Palo Alto.  There's a 40 percent interest in Palo

6    Alto.  We think that there at least -- but there won't be

7    enough money for Palo Alto; how much money will there be in

8    Palo Alto?

9             MR. TOWERY:  Well, we think the top-side equity is

10   probably 150, 160,000; 40 percent of that would be 60,000,

11   something like that.

12            THE COURT:  You guys wait outside for a second.

13            (Whereupon, a discussion was had off the

14            record.)

15            THE COURT:  Okay.

16            MR. TOWERY:  Here's -- while we would like to

17   accommodate Ms. Stevens, here's the practical problem that

18   exists.

19            THE COURT:  Yes.

20            MR. TOWERY:  Sonoma Bank made a loan to TV-32

21   Digital Venture.

22            THE COURT:  Right.

23            MR. TOWERY:  Sonoma Bank took a security interest

24   in everything owned by TV-32 Digital Ventures.

25            THE COURT:  Right.

26            MR. TOWERY:  The building and the equipment.

27            THE COURT:  Okay.

28            MR. TOWERY:  However, we resolved title to TV-32

COPYING PROHIBITED PURSUANT TO GOV. CODE 69954(d)

90

1   as we discussed yesterday in a tax friendly method; that we

2   haven't yet resolved whether it's going to be to Booker as

3   an individual, whether to TV-32 Digital Ventures -- because

4   he's getting the building and the obligations that go with

5   the building.  He also has to get the assets that are

6   pledged as security.  They have to go together.

7          So, TV-32 Digital's assets go with the transfer of

8   1010.  You can't separate them because they've all been

9   pledged to Sonoma National Bank as security for the loan.

10  So, Booker can't give up title to any of those assets

11  without potentially violating the covenants with the bank.

12          MR. HAMERSLOUGH:  I don't agree with that.

13          THE COURT:  I don't either.  I think that -- I

14  think that so long as the bank is in first position, and I

15  agree with that, it doesn't matter if TV-32 sold the asset.

16  They sold the asset subject to the bank's interest in it.

17          MR. TOWERY:  I strongly and respectfully disagree

18  with you folks.  The bank has a security interest --

19          MR. HAMERSLOUGH:  No.

20          MR. TOWERY:  -- beyond the building.

21          THE COURT:  It continues to have it.

22          MR. TOWERY:  And it's not going to give that up.

23          THE COURT:  And it continues to have it.

24          MR. HAMERSLOUGH:  Yeah.

25          THE COURT:  It's subject to that security

26  interest.  So, that anything that he sells or --

27  hypothetically, if these parties decided to sell the

28  equipment, it would be subject to the bank's interest in the

COPYING PROHIBITED PURSUANT TO GOV. CODE 69954(d)

91

1    equipment, unless there's something in there saying you

2    can't sell -- even though I have a security interest in the

3    equipment, you can't sell the equipment; then, you know, you

4    can't sell the equipment, but that would also mean --

5              MR. TOWERY:  No --

6              THE COURT:  That would also mean -- I've got news

7    for you.  KMTP can't have it.  The only one that can have it

8    is W-32.

9              MR. HAMERSLOUGH:  TV-32.

10             THE COURT:  TV-32.  So, it can't be both ways.

11   Either the bank is saying the only one that can have it is

12   TV-32 -- you cannot sell, transfer give away, loan, lease

13   because we have a security interest, and we want you, TV-32,

14   to own it, or you can, so long as it's subject to the

15   security interest.

16             MR. TOWERY:  Well, the problem is we don't have

17   the bank sitting here at the table, and we don't want to do

18   something to cause the bank loan to be called.

19             THE COURT:  Okay, so my suggestion is we reach

20   this agreement subject to the bank agreeing.  So, that the

21   agreement would be TV-32 retains title in the equipment,

22   that the bank be made aware that the equipment is being used

23   by KMTP, that these folks have had a dispute, that we're

24   doing all different things including the transfer of 1010.

25   The bank has to be made aware of that, too.

26             That Mr. Wade has agreed to pay $300,000 for it;

27   that we understand that the equipment -- first priority goes

28   to the bank.  If the bank's interest -- if the bank's loan

COPYING PROHIBITED PURSUANT TO GOV. CODE 69954(d)

92

1  is paid off, which is our intent, and to remove her as a

2  guarantor, that they no longer have a security interest in

3  the equipment.  The equipment would then service the

4  security interest for the $300,000 loan.

5          MR. TOWERY:  But when you say TV-32 will continue

6  to own the equipment --

7          THE COURT:  Right.

8          MR. TOWERY:  -- that statement presupposes how the

9  issue of title to the building is going to be handled.

10          THE COURT:  It doesn't.

11          MR. TOWERY:  When the issue hasn't been decided.

12          THE COURT:  It doesn't, and I'll say it out loud.

13  The parties disagree about ownership of TV-32.  The issue

14  has not been decided.

15          MR. TOWERY:  No, no, no, no, not the litigation

16  issue.  The how was title going to be held pursuant to the

17  settlement agreement issue.

18          THE COURT:  No.  We're leaving that open, too.  I

19  don't need to know -- the parties have two different

20  opinions of it.  I think that we will never need to know

21  because TV-32 has two assets:  1010 and this equipment.  And

22  we know what's happening to 1010.  We know what's happening

23  to the equipment, and we just need a vehicle to make this

24  stuff happen, and we have mutual issues going on here.  So,

25  fine, let it stay in title of TV-32, knowing that the

26  parties disagree about ownership.

27          MR. TOWERY:  Your Honor, I'm sorry, I'm not

28  communicating this very well.  It's not the parties disagree

COPYING PROHIBITED PURSUANT TO GOV. CODE 69954(d)

93

1 about who owns TV-32.  I'll call that the litigation issue.

2 That is an issue in litigation.  We're putting that aside

3 because we're settling the litigation.

4           THE COURT:  Right.

5           MR. TOWERY:  Because yesterday when I said how are

6 we going to effectuate the change of title so that Booker

7 gets 1010, the answer was unknown, in a tax friendly

8 fashion, no reassessment.  That is to be determined.

9           THE COURT:  Right.

10           MR. TOWERY:  And encompassed within that is title

11 could be in Booker's name as an individual person.  It could

12 be in TV-32's name because TV-32 would then become an asset

13 of Booker.

14           And one of the issues here is we also need to talk

15 to the bank and make sure that this change of title to

16 implement the settlement agreement doesn't call the bank

17 loan to be called.

18           And, I mean, we want -- you articulated the

19 policies behind how that's going to be resolved very well.

20 We completely agree with that.

21           To deal with this peripheral issue on the

22 equipment now to say the equipment stays in TV-32

23 contradicts what we were talking about yesterday because it

24 indicates that TV-32 is going to stay with Ms. Stevens.

25           What you're really talking about to accomplish

26 Miss Stevens' desire here is to put her as an individual on

27 the equipment.  I mean, that's the effect of what you are

28 trying to accomplish with your comments.  That's really a

COPYING PROHIBITED PURSUANT TO GOV. CODE 69954(d)

94

1  change in ownership from what it's been.

2          THE COURT:  Well --

3          MR. TOWERY:  I'm not trying to be obstructionist,

4  but...

5          THE COURT:  You're not, and I appreciate -- I

6  appreciate you trying to highlight the issue.  I guess what

7  I'm saying is let's not even -- let's back away from how

8  we're dealing and let's see what we're trying to accomplish.

9          What we're trying -- this is what we're trying to

10  accomplish, that the equipment is being used by KMTP, and

11  that Mr. Wade is going to be responsible for paying for it

12  and will give a note for $300,000; that that note has terms

13  to it which we discussed yesterday; that there will probably

14  be a default on that note immediately; that the equipment

15  which secures the note, albeit a second below the bank,

16  can't be used to pay off the note until the licenses, and

17  Topeka stuff is sold and there's deficiencies.

18          We're really looking to that pot of money to pay

19  off the note with the accumulated late fees and interest.

20  If that amount of money is insufficient to pay off the note,

21  then the bank goes first.  Once the bank is satisfied, the

22  equipment can be repossessed to pay off any deficiencies.

23  That's what we're trying to accomplish.

24          MR. TOWERY:  I agree with that statement.

25          THE COURT:  What Ms. Stevens -- Ms. Stevens, so

26  then your issue then becomes what?

27          MS. STEVENS:  The issue is that -- the issue

28  becomes the ownership of the equipment until the equipment

COPYING PROHIBITED PURSUANT TO GOV. CODE 69954(d)

95

1   is finally paid for by whomever we decide, either by KMTP or

2   by Mr. Wade.

3           THE COURT:  Okay, so our choices are in terms of

4   ownership of the equipment -- until that happens, our

5   choices are TV-32, Stevens, Wade or KMTP.  Those are our

6   four choices.  KMTP because they're using it --

7           MR. TOWERY:  Why don't we put Stevens and Wade on

8   title to the equipment?

9           THE COURT:  How about that?

10          MS. STEVENS:  No.  What would be the reason for

11  putting --

12          THE COURT:  We're just trying to get through --

13          MS. STEVENS:  Right, yeah.

14          THE COURT:  -- this, just a technical thing.

15          MS. STEVENS:  No.  He's proven to be an

16  obstructionist, and I don't trust his name being on the

17  title.

18          THE COURT:  The answer's no.  So, let's come up

19  with -- okay.  So, Mr. Towery, help me out.  Just help me

20  out for a second.  What -- so, if we put TV-32 on, what bad

21  thing would happen?

22          MR. TOWERY:  Well, we could make a determination

23  as we start trying to implement the settlement that the only

24  way that 1010 can be transferred in compliance with the

25  settlement is that TV-32 Digital Venture has to be

26  transferred from Stevens to Mr. Wade.  I don't know that

27  that's going to be the case, but it is absolutely within the

28  realm of possibility.

COPYING PROHIBITED PURSUANT TO GOV. CODE 69954(d)

96

1          THE COURT:  Okay, so let's just do an

2    if-that-happens.  If that happens, then the equipment,

3    ownership of the equipment, title to the equipment will be

4    held in -- and let's just come up with another possibility.

5          MR. FRY:  May I make a comment?

6          THE COURT:  Yes.

7          MR. FRY:  It seems like from what Mr. Towery's

8    saying is that, you know, perhaps the best way to do it is

9    to simply keep title the way it is right now, in the name of

10   TV-32 Digital Ventures.

11         And then, you know, upon our later discussions or,

12   you know, perhaps we'll need the assistance of Judge Silver,

13   you know, there is a determination as to how the title to

14   the property is held.  You know, then at that point in time

15   it would make sense that, you know, this be revisited with

16   respect to the equipment as well.  But, you know, perhaps

17   now, without knowing how that's going to play out, it may

18   even be premature to make the determination or have an

19   agreement as to how --

20         THE COURT:  So, Ms. Stevens, are you willing to

21   say let's leave it in TV-32?  If it turns out that TV-32

22   technically has to become Mr. Wade's, you will leave it to

23   Judge Silver to figure out, well, okay, then let's talk

24   about title then.  And should title have to change, with the

25   understanding -- this is very important -- that under no

26   circumstances will your security interest in the equipment,

27   meaning the pot of money or the equipment securing it be --

28         MR. FRY:  Prejudiced.

97

1        THE COURT:  -- affected by a title change.

2        MS. STEVENS:  He would then have to give up claim

3  to TV-32 Digital Ventures?

4        THE COURT:  No.  You're misunderstanding the issue

5  then.  TV-32 -- we don't know this because we just don't

6  know enough, and this is technical.  But to transfer 1010 to

7  Wade we don't want to trigger a reappraisal.  We don't want

8  to trigger a tax consequence, so --

9        MR. TOWERY:  Or, Your Honor, if I may, a calling

10  of the loan by the bank.

11        THE COURT:  A loan -- calling of the loan.  Some

12  loans say you can't transfer the property.  So, it may be

13  that Wade is going to have to be the owner of TV-32 so that

14  it's not a change of ownership.

15        If that happens, we want to make sure that there

16  are no other assets of TV-32 that he's getting as a

17  consequence that he shouldn't get.  The only other asset is

18  the equipment.  It's the only other asset of TV-32.

19        So, what I'm saying is let's let Silver figure out

20  who should have title pending the paying off of the note

21  with everything in mind, but under no circumstances can your

22  security interest be affected.  So, it's going to be a

23  technical issue because we're going to make sure -- he has

24  to make sure -- this is the agreement, that your security

25  interest in the media equipment is not affected.

26        MR. HAMERSLOUGH:  Right, the security interest

27  being either the equipment itself or the proceeds generated

28  from the real or media properties.

98

1          THE COURT:  Exactly.

2          MR. HAMERSLOUGH:  Yeah, that's perfect.

3          MR. FRY:  But with one caveat, and that is that

4     that presumes that from this point until the point that

5     Judge Silver makes that determination, that Ms. Stevens is

6     the 100 percent owner of TV-32.

7          THE COURT:  We're leaving it open who owns TV-32.

8     We are not deciding ownership.  We have competing claims to

9     TV-32.

10          MR. HAMERSLOUGH:  But your point, Your Honor, is

11     that if we hold that in abeyance and we let Judge Silver

12     decide only so that we could accomplish the technical result

13     that we need without jeopardizing or impairing the two

14     security interests, the equipment and the proceeds from the

15     media sales, that's what we're balancing, correct?

16          THE COURT:  That's correct.

17          MR. HAMERSLOUGH:  That's perfect.

18          MR. TOWERY:  And just to make sure that I

19     understand what the Court is saying, Judge Silver in the

20     final analysis gets to decide this issue, consistent with

21     the principles that you have articulated here this morning.

22     It is not that the parties have to reach some further

23     agreement or else the settlement could fall apart.

24          THE COURT:  That's exactly right, but the parties

25     will have a chance to present their case to him.

26          MR. TOWERY:  Correct.

27          THE COURT:  First, he may try to mediate it.  I

28     don't know how he works.  He may try to get you guys to

COPYING PROHIBITED PURSUANT TO GOV. CODE 69954(d)

99

1   agree to something. Ultimately, whether it's this issue or

2   any issue, you are agreeing to have Judge Silver decide

3   things, act as an arbitrator --

4           MR. TOWERY:  Right.

5           THE COURT:  -- with these principles in mind.

6   Okay, that's everything.  So --

7           MS. STEVENS:  Is that binding arbitration?

8           THE COURT:  Binding arb -- that's another way of

9   putting it, yes, binding arbitration.  He makes the call and

10  you're done, both ways.  Nobody can appeal it.  Nobody can

11  fight it.

12          You folks are in a position where time is of the

13  essence, and you have to have someone there to make a

14  decision quickly because the alternative to that -- and

15  that's one of the things that I think has motivated you to

16  settle as opposed to try the case.

17          If you try the case and you have appellate rights

18  and you can go on and on and on, you, both of you, will lose

19  everything because you have to make decisions about

20  liquidation.  You have to try to liquidate to make this

21  stuff work or refinance or do whoever you can to hang onto

22  this property.  Time equals losing the property, all of it,

23  all of the assets.  And it's something I think we have all

24  agreed to, which is why you need someone to be able to just

25  call it and you both live with it.  So, the answer's yes,

26  both of you, so --

27          MR. TOWERY:  Your Honor, before you voir dire the

28  parties, couple small clarifications.  Number one, when you

COPYING PROHIBITED PURSUANT TO GOV. CODE 69954(d)

100

1 were talking about joint credit cards, you triggered a

2 thought. There is one joint bank account of which we are

3 aware that both remain signatories on. It's a Bank of

4 America account.

5       It's originally Mr. Wade's. He's had it for a

6 long time. Our preference for that would be that rather

7 than close that account, we would just do a new signature

8 card, so that Mr. Wade would be the sole signator on that

9 account. It allows him to get whatever benefits exist from

10 having -- from being a long-time customer of Bank of

11 America. It's not an account that has been used by the

12 parties any time in the past several years.

13       THE COURT: Is that agreeable, Ms. --

14       MS. STEVENS: And then they would say I would not

15 have the benefit for having that account for X number of

16 years, so I would be prejudiced by that.

17       THE COURT: So, you're saying no?

18       MS. STEVENS: Yes.

19       THE COURT: So, you have to close the account.

20 Next one.

21       MR. TOWERY: Okay. Yesterday the issue came up

22 about the Wedding TV, whether there was an FCC issue about

23 whether the station had to retain copies of what is aired;

24 and, therefore, there would be an exception to the

25 everything gets turned over to Ms. Stevens.

26       We found out further information. We think we

27 have a very simple solution that should be in the interest

28 of both parties. Mr. Wade talked to Jim Winston this

COPYING PROHIBITED PURSUANT TO GOV. CODE 69954(d)

101

1  morning.  Jim Winston is a Washington D.C. lawyer who has

2  and continued to represent both Sungilt and KMTP.  Both

3  parties are familiar with him.  He's represented both, and

4  he said that it's not a question of a specific regulation.

5  It is a question of a general FCC regulation that stations

6  keep records of what they've broadcast.

7         For example, they can come back and say did you

8  show obscenity in a show on December 10th.  So, the station

9  would have to have tape of what it showed on December 10th

10  to show they didn't do it.

11         When we talked about this yesterday where we left

12  it on the record was a direction from the Court that this

13  issue would go to Judge Silver to decide if there was an FCC

14  regulation; and if there was, then the station could keep

15  it.

16         Rather than doing that, a simpler solution to this

17  is KMTP won't keep anything regarding Wedding TV, but rather

18  we'll entrust a copy of the hard drives that it's giving

19  back to Ms. Stevens to Mr. Winston; and, therefore, in the

20  event that KMTP gets called upon to need it, Mr. Winston as

21  KMTP's lawyer will have it.  It will accomplish what

22  Ms. Stevens asked for yesterday that KMTP not be left with

23  any of the residual Wedding Television intellectual

24  property.

25         THE COURT:  That sounds good to me, with the

26  understanding that Winston signs an agreement saying that he

27  won't give it to anybody else, that this is protected.  It's

28  her 100 percent property, and he's under the obligation not

COPYING PROHIBITED PURSUANT TO GOV. CODE 69954(d)

102

1    to share it with anybody else unless it's necessary to prove

2    something about KMTP and what they aired to a regulatory

3    authority.

4            MR. TOWERY:  I would simplify it to say unless

5    requested by a regulatory agent, but, yes, with that --

6            THE COURT:  Is that agreeable?

7            MS. STEVENS:  I have a question.

8            THE COURT:  Yes.

9            MS. STEVENS:  Has that -- any of that product been

10   shared with anyone else heretofore?

11           MR. TOWERY:  It hasn't been given to anybody

12   outside the station.  It's been aired, as you know.

13           THE COURT:  So, is it fair to say in making a

14   representation, Mr. Wade, that copies of this tape have not

15   been given to anybody else?

16           MR. WADE:  No, but I'm sure people have copied it

17   because it's always on the air; people copy everything.

18           THE COURT:  Off their own television sets?

19           MR. WADE:  Right.

20           THE COURT:  Anything else?

21           MS. STEVENS:  Yes.  Have any documents or records

22   or research been shared with anyone else?

23           THE COURT:  So --

24           MR. WADE:  I'm sure there has been.  You know, we

25   -- these things -- KMTP and Sungilt produce these things

26   jointly in association with other independent producers, 30

27   of them.  They may well have copies; I don't know.  But I

28   cannot represent there are no other copies of some of this

COPYING PROHIBITED PURSUANT TO GOV. CODE 69954(d)

103

1 stuff or parts of this stuff with other people.  I can only

2 represent KMTP has not given --

3          THE COURT:  We're going beyond --

4          MR. WADE:  Okay.

5          THE COURT:  -- what we're here to do, Ms. Stevens.

6 So, is it okay with you that Winston holds onto it with him

7 signing an agreement about not sharing the information with

8 anybody?

9          MS. STEVENS:  That part is; yes, that's

10 acceptable.

11          THE COURT:  Okay, all right.  So, now we're up to

12 the time of --

13          MS. STEVENS:  No.  We didn't deal with the

14 equipment that belongs to WTV.

15          MR. FRY:  That's still reserved with Judge Silver.

16          MS. STEVENS:  And the ownership of Sungilt.

17          MR. FRY:  Well, I mean, my suggestion with respect

18 to Sungilt, the sell licenses and the -- I guess it's only

19 really the sell licenses are owned by Sungilt; and that upon

20 the sale of those licenses, the corporation be dissolved

21 unless you want to hold onto it.  And I don't know if

22 Mr. Wade would have any objection --

23          THE COURT:  Do you want to hold onto it?

24          MS. STEVENS:  Yes.

25          THE COURT:  Okay, so the last thing is once the

26 assets of Sungilt are sold, the corporation will not be

27 dissolved, and the parties agree that Ms. Stevens will

28 become a hundred percent owner of the corporation Sungilt.

COPYING PROHIBITED PURSUANT TO GOV. CODE 69954(d)

104

1    MR. WADE:  I have no problem with that, but it

2  seems to me that that's the same kind -- TV-32, it's just a

3  name, and --

4    THE COURT:  We're doing things one at a time.

5    MS. STEVENS:  And is TV-32 Digital Ventures being

6  asked to be dissolved?

7    THE COURT:  We're not -- we're leaving -- is it

8  being asked to be dissolved?  We don't know what's going to

9  happen with TV-32.

10    MS. STEVENS:  Because it goes to Judge Silver?

11    THE COURT:  Yes.  All right.

12    MR. TOWERY:  Well, specifically, because the Court

13  articulated the policy reason that the transfer of title be

14  done in a way that --

15    THE COURT:  So --

16    MR. TOWERY:  -- minimizes tax consequences or loan

17  consequences.

18    THE COURT:  Let me just say, and then what

19  ultimately happens to TV-32 will be a Judge Silver call if

20  the parties disagree.

21    MR. TOWERY:  Fine.

22    THE COURT:  Okay.  Ms. Stevens.

23    MS. STEVENS:  I'd like to know if there are any

24  outstanding debts or commitments against -- or regards to

25  WTV or Sungilt or TV-32 Digital Ventures.

26    THE COURT:  Is there anything that we don't know

27  about that you know about?

28    MR. WADE:  Sungilt --

COPYING PROHIBITED PURSUANT TO GOV. CODE 69954(d)

105

1           MR. TOWERY:  Let me answer the question first, and

2   we can have Booker assent to what I say or add to what I

3   say.

4           With respect to Wedding TV, there is nothing from

5   Mr. Wade or KMTP that constitutes a debt or an obligation.

6   With respect to Sungilt, the same statement can be made.

7   With respect to TV-32 Digital Ventures, the corporation has

8   been in the control of Ms. Stevens.  We are not

9   independently aware of any obligations that Mr. Wade has

10   incurred on behalf of TV-32 Digital Venture.

11           This does raise one ancillary point, and that is

12   there was a notice to quit that was served in December by

13   TV-32 Digital Venture on tenants at 1010.  And I'm assuming

14   that there will be an affirmative statement in the

15   settlement agreement that TV-32 Digital Venture will cease

16   and desist from any further steps to evict any tenant.

17           THE COURT:  That would be accurate.

18           MR. HAMERSLOUGH:  Correct.

19           THE COURT:  Mr. Wade, anything else?

20           MR. WADE:  She -- the question's very broad about

21   debts to Sungilt.  And I can remember from earlier years

22   there's still some unpaid bills; accounting firm comes up.

23   And I'm sure there might be others but nothing new that I

24   have added since post-separation.

25           MR. HAMERSLOUGH:  Judge, my suggestion would be to

26   the extent there is such an issue, that we leave it with

27   Judge Silver.

28           THE COURT:  Is that agreeable?

106

1          MR. TOWERY:  I agree with that.

2          THE COURT:  All right.  Anything else,

3  Ms. Stevens?

4          MR. FRY:  Did we discuss the other credit line or

5  however you want to refer to it as that they hold jointly?

6  It's a Discover card; also, that both their names are on it,

7  and I don't know if we discussed it.

8          MR. WADE:  Both our names are on it, and I assume

9  both have charged to it, so I don't --

10          THE COURT:  So, each of you are responsible for

11  your own charges.  If you disagree about who made the

12  charge, it goes to Silver, and that credit card has to be

13  destroyed as of today.

14          MR. HAMERSLOUGH:  Agreed.

15          THE COURT:  So, this agreement is, if we get

16  around to getting people to agree to it, is binding as of

17  today.  It's not binding as of when we come up with a

18  written agreement.  It's binding as of today.  Destroy those

19  cards.  Stop using joint cards.  Ms. Stevens, we're ready.

20          MS. STEVENS:  Yes.  I would like Mr. Wade to sign

21  a statement as to what he just attested to, that there are

22  no outstanding debts.

23          THE COURT:  You have him on the record.

24          MR. HAMERSLOUGH:  It's on the record.

25          THE COURT:  All right, so --

26          MR. HAMERSLOUGH:  Under penalty of perjury.

27          THE COURT:  Ms. Stevens, we're now ready -- we're

28  done.  So, we have all the terms.  We're now moving forward.

107

1    I'm going to actually start with Mr. Wade.  Mr. Wade, did

2    you understand everything we just said --

3                MR. TOWERY:  Yes.

4                THE COURT:  -- over the last two days?  I mean,

5    this is more than one day's worth of settlement talks.

6                MR. WADE:  Yes.

7                THE COURT:  Do you have any questions at all?

8                MR. WADE:  No.

9                THE COURT:  Do you agree to these terms and

10   conditions?

11               MR. WADE:  Yes.

12               THE COURT:  Do you want me to make this a court

13   order?

14               MR. WADE:  Yes.

15               THE COURT:  Ms. Stevens, did you understand

16   everything we said?

17               MS. STEVENS:  I would like one section to be

18   reviewed.

19               THE COURT:  Okay.

20               MS. STEVENS:  And that is in regards to 1010.

21               THE COURT:  Okay.  What don't you -- you tell me

22   what you understand about 1010.

23               MS. STEVENS:  I would like the whole thing to be

24   reviewed.

25               THE COURT:  You tell me what you understand about

26   1010.  It's going to go faster this way.  What do you

27   understand what's going on about 1010?  Who's going to own

28   it after today?

COPYING PROHIBITED PURSUANT TO GOV. CODE 69954(d)

108

1          MS. STEVENS:  Mr. Wade.

2          THE COURT:  And who's going to be responsible for
3  any money past due?

4          MS. STEVENS:  Mr. Wade.

5          THE COURT:  What else do you need to know?

6          MS. STEVENS:  I currently have two offices in
7  1010, and I would like to keep those offices.

8          THE COURT:  We've talked about that yesterday, and
9  I said once he owns it you don't have a right to be there.
10  So, we've talked about that.  When he owns it, you don't
11  have a right to be there.  Do you have any other questions?

12          MS. STEVENS:  I'd like to speak to my lawyers.

13          THE COURT:  Okay.

14              (Pause in proceedings.)

15          THE COURT:  Okay.  We're back on the record.
16  Ms. Stevens, did you understand everything I just said?

17          MS. STEVENS:  Yes.

18          THE COURT:  Do you have any questions at all?

19          MS. STEVENS:  Yes, I do.

20          THE COURT:  Okay.

21          MS. STEVENS:  There are furnishings at 1010
22  Corporation Way that belong to me and that belong to TV-32
23  Digital Ventures, and I would like those.

24          THE COURT:  Do you know what she's referring to?

25          MR. WADE:  No, I don't.

26          THE COURT:  Do you want to be more specific?

27          MS. STEVENS:  Office furniture.

28          THE COURT:  Okay, so --

COPYING PROHIBITED PURSUANT TO GOV. CODE 69954(d)

109

1      MR. WADE:  KMTP's --

2      THE COURT:  So, you know, never brought up before.

3  I think the contemplation is when ownership is going to

4  somebody, it's everything.  That's certainly not true about

5  personal effects, and we talked about Woodside in that

6  respect.

7      MS. STEVENS:  Mm-hm.

8      THE COURT:  But when we're talking about getting

9  the building over there, it includes the furnishings.  So,

10  the answer to your question is the furnishings would go to

11  Wade.

12      MS. STEVENS:  Okay.  I don't agree with that.  And

13  some of the furnishings I purchased with my own money.

14      THE COURT:  Okay, so it's brand new, haven't heard

15  anything.

16      MS. STEVENS:  Because we're looking at the issues

17  now.

18      THE COURT:  It's okay, yeah.  We're not looking at

19  the issues now.  We've been looking at the issues for two

20  and a half days, so --

21      MR. FRY:  Your Honor, I have a suggestion.

22      THE COURT:  Yeah.

23      MR. FRY:  With respect to, you know, any

24  furnishings that she personally purchased, number one, I

25  don't know if Mr. Wade would -- even has an objection to

26  providing her with those furnishings.  And if he does and he

27  feels that those identified furnishings were in fact paid by

28  KMTP, you know, perhaps we can reserve to Judge Silver based

COPYING PROHIBITED PURSUANT TO GOV. CODE 69954(d)

110

1   on evidentiary proof.

2           MR. TOWERY:  Let me say two things.  We are happy

3   to have a meet and confer process.  And if she identified

4   specifically what it is that she wants and it's within any

5   broad range of reasonableness, we'll be happy to give her

6   the furnishings at issue.

7           THE COURT:  If it's not, meaning she says she --

8   it belongs to her and you say it doesn't, are you willing to

9   let that go to Silver?

10          MR. TOWERY:  Yes, we are.

11          THE COURT:  Mr. Wade?

12          MR. WADE:  Yes.

13          THE COURT:  Is that agreeable?

14          MR. WADE:  Yes.

15          THE COURT:  Ms. --

16          MS. STEVENS:  Well, not only the furnishings that

17  belong to me individually but the furnishings that belong to

18  TV-32 Digital Ventures.

19          THE COURT:  We -- off the record.

20              (Whereupon, a discussion was had off the

21          record.)

22          THE COURT:  Okay.  I think there are two last

23  questions that Ms. Stevens has.  One we've touched on is the

24  furnishings in 1010 Corporation Way.  My understanding is

25  that the parties will agree to meet and confer.  She'll give

26  a list of what she thinks is hers.  If the parties agree,

27  that ends that.

28              To the extent there's disagreement, and that means

COPYING PROHIBITED PURSUANT TO GOV. CODE 69954(d)

111

1  that she believes either it came out of her own personal

2  money or TV-32 Digital, and I know there's a dispute about

3  who owns TV-32 Digital, that Silver decides those issues.

4  Is that -- with respect to furnishings of 1010.  Is that

5  agreeable, Mr. Wade?

6           MR. WADE:  Yes, it is.

7           THE COURT:  Ms. Stevens?

8           MS. STEVENS:  Yes.

9           THE COURT:  And then the very, very last thing is

10  there's, quote, equipment of TV-32.  I think we've said this

11  a number of times.

12           MS. STEVENS:  No, no, no, not TV-32.

13           THE COURT:  Oh, what?

14           MS. STEVENS:  Oh, I'm sorry; that equipment that

15  was purchased with monies, my monies.

16           THE COURT:  Do you know what equipment you're

17  talking about?

18           MS. STEVENS:  Um, I would have to get a list to

19  you.

20           THE COURT:  I mean, can you even give me an

21  example?

22           MS. STEVENS:  An example is like a small editing

23  system.

24           MR. TOWERY:  Didn't we talk about this at length

25  yesterday?

26           THE COURT:  Isn't that --

27           MS. STEVENS:  No, that's different.  It's not an

28  editing system; I'm sorry.  I don't really know.  It's kind

COPYING PROHIBITED PURSUANT TO GOV. CODE 69954(d)

112

1   of like a computer and you do editing work on it.

2          THE COURT:  So, what you're saying is you think

3   there's equipment and maybe there's -- in 1010 that you

4   think can be traced to your personal money?

5          MS. STEVENS:  Yes, my personal account.

6          THE COURT:  And you want the ability to go to

7   Silver --

8          MS. STEVENS:  Yes.

9          THE COURT:  -- to say I can prove this came from

10  my personal money and I have a claim to it?

11         MS. STEVENS:  Yes, yes.  That, you know,

12  everything that came out of my personal account I have a

13  claim to, yes.

14         MR. TOWERY:  May we have one question for clarity?

15         THE COURT:  Yeah.

16         MR. TOWERY:  When the word "personal account" was

17  used making reference to a TV-32 Digital account or an

18  Arlene Stevens account distinct from --

19         MS. STEVENS:  Bank of America account.

20         THE COURT:  Bank of America.

21         MS. STEVENS:  Bank of America and credit cards,

22  Bank of America, yeah.

23         THE COURT:  So, a personal credit card and a

24  personal account, personalized to Arlene Stevens?

25         MR. WADE:  The joint Bank of America account or?

26         THE COURT:  The joint account or your --

27         MS. STEVENS:  The joint account and the Amnesty

28  Bank credit card.

COPYING PROHIBITED PURSUANT TO GOV. CODE 69954(d)

113

1          THE COURT:  Okay.  Then that -- off the record.

2          (Whereupon, a discussion was had off the

3     record.)

4          THE COURT:  On the record.  We've talked about how

5     we're not doing tracing.  So, that if money was on -- if

6     there's a charge to Mr. Wade's personal credit card --

7          MS. STEVENS:  That was paid for by my account.

8          THE COURT:  Right, fair enough.  We're not doing

9     that tracing.  We're not undoing years and years of you

10    paying for him.

11         MS. STEVENS:  No, it's not years and years and

12    it's not me paying for him.  That's why I said it's

13    equipment that I'm looking at.

14         THE COURT:  I --

15         MS. STEVENS:  Not tracing of anything else.

16         THE COURT:  Mr. Towery, what's your response?

17         MR. TOWERY:  We agree with the Court's comments.

18         THE COURT:  I mean, you're not even able to tell

19    me what it is.  You know, you're talking about, well, one

20    thing might be an editing something.  I mean --

21         MS. STEVENS:  That's what it's used for.  You

22    know, I don't have the model number.  I don't have the name,

23    but...

24         THE COURT:  Ms. Stevens, are you able to let that

25    one go?

26         MS. STEVENS:  No.

27         THE COURT:  The only thing I can think of is that

28    she make a list of all the equipment she has in mind, what

COPYING PROHIBITED PURSUANT TO GOV. CODE 69954(d)

114

1  she's able to trace, the sources of funds. And that if she

2  believes she can prove that it's hers, it goes to Silver for

3  a determination. Is that agreeable?

4          MR. TOWERY: Is this the final issue?

5          THE COURT: It is.

6          MR. TOWERY: Then I would recommend it to you

7  being the final issue; is that an agreement, Mr. Wade?

8          MR. WADE: Yes.

9          THE COURT: Ms. --

10          MS. STEVENS: Yes.

11          THE COURT: -- Stevens, you understood everything

12  I said?

13          MS. STEVENS: Yes.

14          THE COURT: You are -- do you have any -- I assume

15  you have no other questions; is that correct?

16          MS. STEVENS: That's correct.

17          THE COURT: Do you agree to these terms and

18  conditions?

19          MS. STEVENS: Yes, I do.

20          THE COURT: Do you want me to make this a court

21  order?

22          MS. STEVENS: Yes, I do.

23          THE COURT: Okay, so we have an agreement. It's

24  binding as of now. The dates that we set up are binding as

25  of now, even if the settlement agreement follows. So, you

26  have to be prepared to move. You have to effectuate the

27  inspection of Woodside and 1010.

28          MR. HAMERSLOUGH: And 1010. Jim?

115

1              MR. TOWERY:  Are you going to draft it?

2              MR. HAMERSLOUGH:  Sure.

3              MR. TOWERY:  Thank you.

4              MR. HAMERSLOUGH:  Fair enough.

5              MR. TOWERY:  I will owe you the next one.

6              THE COURT:  And you'll get a transcript.  IF there

7    are any disagreements, I ask that you first meet and confer.

8    If you can't, then take a draft.  Then don't just do a whole

9    different copy.  Just highlight the part that one side

10   doesn't like and the alternate language, along with the

11   parts of the transcript you think support you because I go

12   off the transcript to determine what version of the signed

13   agreement to go with.

14              I know this has been a long, long time.  I wish I

15   could spend more time with you.  Let me just say this.  I

16   think the reason why this took so long, and I have to say it

17   for both of you, and it's not just Ms. Stevens.  It's

18   Mr. Wade, too.  This has been a very emotional thing for

19   both of you.  Reaching this decision has been emotional for

20   both of you.  You have had a long relationship.  It has had

21   its ups and downs.

22              But when people have long relationships, it comes

23   with a lot of emotion.  And the two of you, both of you have

24   a lot of emotion.  I am hoping and I know that there's still

25   some litigation pending, and there are some serious issues.

26   And the Court takes seriously issues of domestic violence,

27   so I don't want to get too much into that other than to say

28   I hope that your ability to reach this agreement today will

COPYING PROHIBITED PURSUANT TO GOV. CODE 69954(d)

116

1 release you from some of the pain and anxiety and will have

2 you both living better off in terms of being able to salvage

3 some of the assets that I know once existed in far better

4 shape than they exist today.

5      You folks are the victims of a very, very bad

6 economy, and it's distressing to see what was a huge pile of

7 money dwindle this way. So, I am hoping and I firmly

8 believe that this agreement will help you in a way a trial

9 never could, leave both of you better off.

10      I not only want to thank both of you coming here

11 and reaching a very difficult agreement for both of you but

12 your attorneys. Your attorneys have been outstanding. They

13 are some of the best attorneys in our county, and they

14 certainly have proven so in terms of how they've been here,

15 both in terms of their level of preparation and their

16 professionalism. I as a judge couldn't have asked for

17 anything better, so thank you all very, very much.

18      MR. HAMERSLOUGH: Your Honor, once again, thank

19 you very, very much for the time and energy and creativity

20 and insight. Thank you.

21      THE COURT: You're welcome.

22      MR. TOWERY: I don't know of anybody else who

23 could have done this. We appreciate it.

24      THE COURT: You're very welcome, and I really do

25 hope that life for both of you will only be enhanced as a

26 result of this. Thank you very much.

27      MR. TOWERY: Thank you.

28      (Whereupon, the proceedings were concluded.)

COPYING PROHIBITED PURSUANT TO GOV. CODE 69954(d)

117

1   STATE OF CALIFORNIA     )
                            )
2   COUNTY OF SANTA CLARA   )

3

4           I, PATRICK K. CROWLEY, CSR #11271, HEREBY
    CERTIFY:

5

6       That the foregoing is a full, true, and correct

7   transcript of the testimony given, of the evidence offered

8   and received, and statements of the Court, also all

9   objections of counsel and all matters to which the same

10  relate, in the proceedings had, entitled:  IN THE MATTER OF:

11  ARLENE STEVENS, SUNGILT CORPORATION and TV-32 Digital

12  Ventures, INC. versus COOPER-FOWLER MEDIA COMPANY, MINORITY

13  TELEVISION PROJECT, INC., GREG TALLEY, SHEILA ROBERTSON

14  TALLEY and BOOKER T. WADE, JR., Case number 1-07-CV-090284,

15  taken on January 22, 2009;

16      That I reported the same in stenotype to the best of my

17  ability, being the duly-appointed, qualified, and acting

18  official stenographic reporter of said court, and thereafter

19  transcribed the same into typewriting as herein appears.

20      I further certify that I have complied with CCP _ 237

21  (a) (2) in that all personal juror-identifying information

22  has been redacted, if applicable.

23

24      DATED:  March 6, 2009

25

26

27   _____

28          Patrick K. Crowley, CSR  #11271

**Exhibit D**

Presentations to Judge Silver

Stevens v Wade REF# 1110011534

booker wade
8/10/10

To: Richard Silver
Cc: David Hammerslough, Robert Chiles, Cynthia Victory, linda@rhrc.net



From: **booker wade** (bookertwade@hotmail.com)
Sent: Tue 8/10/10 12:20 PM
To: Richard Silver (rsilver@mbay.net)
Cc: David Hammerslough (dave@rhrc.net); Robert Chiles (rchiles@chilesprolaw.com); Cynthia Victory (cvictory@jamsadr.com); linda@rhrc.net

Judge Silver:

I understand that Mr. Hamerslough has requested a hearing regarding the Palo Alto condominium and Wedding Television. As to the Palo Alto condo, you have previously heard and addressed issues/arguments from both sides. You concluded it was not appropriate to proceed further. As to the Wedding Television programming assets, the Settlement Agreement required these assets to be delivered to Ms. Stevens in exchange for her dismissing KMTP TV. The assets were provided to Ms. Stevens in December 2009. Ms. Stevens refused to file the dismissal maintaining that some unidentified items were missing. In February 2010, the Presiding Judge directed Ms. Stevens to provide an affidavit under oath as to any missing items. She has refused to do so. She apparently is judge shopping seeking your intervention to overrule the Presiding Judge. Given the circumstances, a hearing is unnecessary. If anything, given Ms. Stevens' refusal to file the dismissal and to comply with the Presiding Judge's directive, I ask that you summarily conclude that KMTP TV and I are excused from any obligations.

Booker Wade



ROSSI   HAMERSLOUGH   REISCHL   CHUCK        1960 The Alameda. Suite 200 San Jose. CA 95126 P (408) 261-4252 F

May 18, 2010

**(Sent Via Email)**

Hon. Richard Silver
JAMS
160 W. Santa Clara Street, #1150
San Jose, CA 95113

> Re:   **Stevens / Wade**
>        **Your File:   79316**
>        **Our File:   D08115**

Dear Judge Silver:

This letter is submitted with regard to the issues that will be addressed at tomorrow morning's hearing.

The Palo Alto condominium property has still not been listed for sale by Mr. Wade despite numerous efforts on the part of Ms. Stevens' counsel and orders by you that it be listed and sold.  (Order dated April 10, 2009, July 10, 2009 and August 14, 2009.)  The listing brokerage and agent (Alain Pinel/Shelley Roberson) have been selected.  The listing agreement and other documents were forwarded to Mr. Wade's counsel on April 10, 2009.  Mr. Wade has still failed to sign the listing agreement and other documentation.  Mr. Wade has had exclusive possession of the property since May 2009.

Stevens requests that this property be listed and sold.  Any issues regarding carrying costs were reserved by you pursuant to prior orders.  Stevens requests that Wade pay Stevens rent for the occupancy of the Palo Alto condominium since May of 2009.  This request is based on the fact that Mr. Wade has not complied with prior orders to list the property.  Mr. Wade has done nothing more than attempt to either undermine or undo this settlement.  These efforts have resulted in his getting the benefit of occupying the condominium and causing Ms. Stevens to incur unnecessary additional attorney's fees and costs.  From Stevens' perspective, had Wade complied with the settlement the Palo Alto condominium would have been sold and Ms. Stevens would not have incurred the additional attorney's fees and costs.  Stevens seeks reimbursement of all attorney's fees and costs incurred as a result of Wade's delay tactics.  Stevens also seeks to be relieved of any further financial responsibility for the carrying costs associated with the Palo Alto condominium and that Mr. Wade start paying rent to her to the extent that she has a 60% interest in this property.

May 18, 2010
Page 2

      With regard to 1010 Corporation Way, the bankruptcy court has requested a decision as to who has control of TV-32.  The answer to that question will then allow the bankruptcy court to make a decision on two competing requests: (1) Wade's three year plan for a resale or refinance of the 1010 Corporation Way property or (2) Stevens' request that a trustee be appointed who will then take control of the management and sale of the property.  Stevens' request is based, in part, on the fact that Wade continues to rent space at 1010 Corporation Way but not make any payments to Sonoma National Bank or the SBA and on the fact that the Bank of Sonoma has filed an action in Sonoma County Superior Court against Arlene Stevens seeking to enforce the guarantee that Ms. Stevens signed on behalf of TV-32.  Sonoma National Bank has obtained a temporary protective order and has scheduled a hearing on June 1, 2010 for a Writ of Attachment.  They are requesting an attachment against all of the proceeds from the sale of the Woodside property.

      A fundamental component of the settlement between Stevens and Wade is that Arlene Stevens be relieved of any liability on the guarantee to Sonoma National Bank and the SBA.  The sale of 1010 Corporation Way as well as other media assets was also to act as security for repayment of money that Mr. Wade owes Ms. Stevens under the settlement.  Both of these are now in jeopardy.  Ms. Stevens' money (Woodside proceeds) is now at risk because of Wade's prior conduct regarding the sale of the property and his request to continue to market the property for three years.  The Corporation Way property is the security device for the obligations which Mr. Wade owes Ms. Stevens under the settlement and her only protection against a deficiency.  The bank has supplied the bankruptcy court with an appraisal of the property showing a current value of approximately $4.3 Million.

      The objectives of the settlement are not being met and Ms. Stevens' security interest is being adversely effected by the foregoing conduct and events.  If this status quo continues then the objectives of the settlement will not be met and Ms. Stevens will be prejudiced because the proceeds from the sale of Woodside will be attached by Sonoma National Bank.  For these reasons control of TV-32 rests with Ms. Stevens.  Otherwise, the goal and objectives of the settlement will be frustrated.  Mr. Wade has had his opportunity to market the property.  He has provided this Court with inflated opinions of market value and has not provided this Court with any of the accounting and other information that it has requested regarding this property.

      Stevens's contention that ownership and control of TV-32 should be vested in Stevens in order to achieve the objectives of the settlement is also supported by the historical evidence on this issue.  In or around May of 2004, TV-32 Digital Ventures ("TV-32") was incorporated in the State of California. At all relevant times, Ms. Stevens has been, and is, the sole officer, director, and owner of TV-32. Mr. Wade was secretary to the corporation for a very brief period during its initial formation. Mr. Wade fraudulently executed documents relating to the corporation. Mr. Wade has produced stock certificates that he alleges are authentic. Ms. Stevens

May 18, 2010
Page 3

disputes their authenticity and maintains that they are not only false but that if they had been issued, they were issued in violation of the Corporate By-Laws. The By-Laws specify that the same person can not hold both the offices of President and Secretary. The By-Laws were prepared by Mr. Wade and signed by him in his capacity as Secretary of the corporation. The stock certificates however are signed only by Mr. Wade in a purported capacity as both President and Secretary. Ms. Stevens' signature is not on the purported share certificates. In any event, the purported certificates would be deemed voidable in that, on their face, they are in violation of the Corporate By-Laws.

The conclusion that Ms. Stevens is the sole officer, director, and owner of TV-32 is also supported by the SBA financing plan for this entity prepared by Mr. Wade and submitted to Sonoma National Bank and the SBA in support of the request for the financing which currently encumbers the property.  Copies of this financing plan as well as the documents referred in the preceding paragraph are available if requested by the Court.

Stevens is requesting an order as follows:

"Arlene Stevens is hereby appointed to serve as the sole director and President of TV-32 Digital Ventures, Inc. ("TV-32 DV"), with all the rights and powers of a director and of a president, from and after the date of this order and until further order. Arlene Stevens cannot be removed from these positions by any shareholder vote, vote of any board of directors, or act of any officers of TV-32 or those claiming to be shareholders, directors, or officers of TV-32 until further order. Booker T. Wade, Jr., from and after the date of this order and until further order, shall not serve as a director or officer of TV-32 and cannot assert any rights relative to the appointment of Arlene Stevens as the sole director and President of TV-32, whether as an officer, director, or shareholder, until further order. This order is prospective in nature and does not suggest or make any findings regarding the status of Arlene Stevens and her claims relative to her status as a officer, director, or shareholder of TV-32 prior to the date of this order. Booker T. Wade, Jr. will fully cooperate with TV-32 and Arlene Stevens to secure prompt and complete compliance with this order."

Very truly yours,

(Dictated but not read.)

David Hamerslough

DH:lld
cc:    Client
cc:    Stephen S. Fry, Esq.
cc:    Booker T. Wade
S:\CL\D\D08115\Correspondence\JAMS (Silver)-Wade 05-18-10.doc

**Exhibit E**

Table of Litigated Claims Delegated to Judge Silver

Specifically Identified Potential Disputes
Assigned to Judge Silver But Resolved by the Superior Court

| Dispute | Reporter's Transcript | Judgment Page No. |
|---|---|---|
| Palo Alto Condo | | 1, 2 |
|    Sale Disposition | 15:24-28; 16:1-2; 17:15; 78:14-1 | |
|    Sale Disputes | 30:16-21; 80:9-12 | |
|    Deficiency | 17:17-20 | |
|    Carrying Costs | 63:19-25 | |
|    Indemnification and | | 2 |
|    Good Faith Cooperation | 17:17-22; 1-11 | |
| | | |
| Cellular Licenses | | 2 |
|    Disposition | 19:20-28; 15:24-28 | |
| | | |
| Woodside Residence | 15:24-28 | 2 |
|    Sale Proceeds | 20:1-28; 21:1-28; 22:1-24 | |
| | | |
| Office Building | 9:19-22;15:24-28 | 2 |
|    1010 Corporation Way | | |
| | | |
| Note for Broadcast Equipment | 19:12-18; 71:6-9 | 2 |
| | | |
| Adequacy of Sale Prices | 28:14-19 | |
| | | |
| Arbitration and Scope | | |
|    Binding | 80:21-28; 81:1; 99:8-11 | |
|    Broad discretion | 29:28 | |
|    Maximize Economics | 30:1-9 | |

**Exhibit F**

Order of Disqualification

**(ENDORSED)**

# F I L E D

APR 0 2 2010

**DAVID H. YAMASAKI**
Chief Executive Officer/Clerk
Superior Court of CA County of Santa Clara
BY_____ DEPUTY

## SUPERIOR COURT OF CALIFORNIA

## COUNTY OF SANTA CLARA

| | |
|---|---|
| ARLENE D. STEVENS | Case No.    1-07-CV-090284 |
| Plaintiff, | Order re:    Disqualification |
| v. | |
| BOOKER T. WADE, JR., AND DOES 1 to 10, inclusive | |
| Defendant. | |

On March 29, 2010, for reasons fully set forth on the record on March 25, 2010, I recused myself from this case pursuant to Code of Civil Procedure section 170.1 (a)(8).

Dated:  4/2/10

_____
Jamie Jacobs-May, Presiding Judge

Order Re:  Disqualification                                                    Page 1 of 1